Park Towne and Madway Engineers and Constructors, Petitioners *v.* Pennsylvania Public Utility Commission, Respondent, Lukens Steel Company et al., Intervenors.

Philadelphia Electric Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. Lukens Steel Company et al., Intervenors.

286

Argued June 3, 1981, before President Judge CRUMLISH and Judges ROGERS, BLATT, MACPHAIL and PALLADINO. Judges MENCER, WILLIAMS, JR. and CRAIG did not participate.

*Philip P. Kalodner,* with him *Jerrold V. Moss, Fell, Spalding, Goff & Rubin,* for petitioner, Park Towne and Madway Engineers and Constructors.

*Robert H. Young,* with him *Walter R. Hall, II, Thomas P. Gadsden and Susan L. Gordon,* of counsel; *Edward G. Bauer, Jr.* and *Morgan, Lewis & Bockius,* for petitioner, Philadelphia Electric Company.

*William T. Hawke,* Counsel, with him *Albert W. Johnson, III,* Assistant Counsel, *Steven A. McClaren,* Deputy Chief Counsel, and *Joseph J. Malatesta,* Chief Counsel, for respondent, Pennsylvania Public Utility Commission.

*Edward J. Riehl, McNees, Wallace & Nurick,* for intervenor, Lukens Steel Company, Union Carbide Corporation and Celotex Corporation.

*Henry M. Wick, Jr.,* with him *Charles J. Streiff,* of counsel: *Kenneth R. Pepperney, Wick, Vuono & Lavelle,* for intervenor, United States Steel Corporation.

*Martha W. Bush,* Assistant Consumer Advocate, with her, *Craig R. Burgraff,* Assistant Consumer Advocate, for Mark P. Widoff, Consumer Advocate.

*Steven P. Hershey,* with him *Mark B. Segal,* for intervenors, Consumers Education and Protective Association, Pennsylvania Association of Community Organizations for Reform Now, Action Alliance for Senior Citizens, and Max Weiner.

OPINION BY JUDGE ROGERS, August 17, 1981:

On August 5, 1977, the Philadelphia Electric Company (PECO) filed with the Pennsylvania Public Utility Commission (Commission) Supplements Nos. 72 and 73 to its Tariff Electric—Pa. P.U.C. No. 24 to become effective October 4, 1977. Supplement No. 72 eliminated the fuel adjustment clause for residential and small commercial customers while rolling into their base rates approximately 0.9 cents per kwh and created a new energy adjustment clause for all other customers, primarily large commercial and industrial, rolling into their base rates a portion of the present charge. By Supplement No. 73, PECO proposed a

base rate increase in annual revenues in the amount of about $115.8 million or 11 per cent based on operating results for the test year ending December 31, 1977. Complaints against the proposed rate increase were filed by, among others, Park Towne and Madway Engineers and Constructors (Park Towne), apartment house owner customers of PECO, and the Consumer Advocate.

To R.I.D. 438 the Commission initiated an investigation of the proposed rates and suspended both Supplements. By order adopted September 26, 1977, the Commission declined to lift the suspension of Supplement No. 72, but gave PECO interim relief in the form of continued accruals of Allowance of Funds During Construction (AFDC) on its investment in Salem No. 1 nuclear plant from July 1 to December 31, 1977, although the plant had gone on line June 30, 1977. The Commission further directed that the Administrative Law Judge (ALJ) assigned to the case file an interim decision indicating what additional relief, if any, should be granted. Pursuant to this Order, a Recommended Order was issued by the ALJ on December 30, 1977, calling for the approval of an interim revenue increase of $32.5 million. (PECO had by this time made it clear that, by reason of events happening since its filing, Supplement No. 72 would no longer be an effective measure for increasing revenues and should therefore not be further considered by the Commission.)

On February 24, 1978, the Commission allowed the company interim relief in the amount of $11.883 million. In response to a petition by PECO requesting the establishment of temporary rates to provide additional relief in the amount of $41.8 million, the Commission on July 10, 1978, established temporary rates at the level of the previously effective interim relief, $11.883 million.

On November 15, 1978, the ALJ presented a recommended order allowing $73,247,000 of additional annual revenues. On December 28, 1978, the Commission held a public session and adopted an order, finally entered February 5, 1979, allowing an increase of annual revenues of $78,894,000 and requiring PECO to restructure rates for the HT (high-tension voltage) and PD (primary voltage) customers so as to "eliminate to the extent reasonably possible variations in rate of return from customers within these classes." Park Towne and PECO each filed appeals from this order. A rate schedule (Alternative 1) was submitted by PECO and eventually adopted by the Commission by an order entered April 7, 1980. Park Towne also appealed the April 7, 1980, order.

Our review is limited to a determination of whether constitutional rights have been violated, an error of law committed, or whether the findings, determinations and order of the Commission are supported by substantial evidence. *Blue Mountain Consolidated Water Company v. Pennsylvania Public Utility Commission,* 57 Pa. Commonwealth Ct. 363, 426 A.2d 724 (1981).

We shall first examine Park Towne's questions.

### I. PARK TOWNE'S APPEAL

#### A. *Rate Structure*

Park Towne contends that the Commission erred in approving what it terms a discriminatory rate schedule assertedly imposing a disproportionate share of the utility's costs on mid-demand (HT-500 and 1,400 kw, PD-125 and 175 kw) HT and PD rate class customers causing them to provide PECO with a disproportionately higher return on cost of service than that contributed by low (HT-25 and 100 kw, PD-25 kw) and high (HT-50,000 kw, PD-500 kw) demand apartment owners.

290

In its February 5, 1979, order, the Commission recognized fault in the rate structure proposed in PECO's tariffs and suggested a plan for restructuring the rate schedule HT and PD. On February 20, 1979, Park Towne, the Consumer Advocate and an another public interest group filed a Petition for Modification, Correction and Reconsideration by the Commission of certain aspects of the February 5, 1979, order, including the rate structure in issue. The Commission agreed to reconsider rate structure especially as PECO demonstrated that the Commission-ordered rate design increased some customer's rates more than 80% while decreasing the rates of others. PECO offered another rate structure, Alternative 1, which the Commission found "to accomplish a significant reduction in the inequality of returns from customers within those schedules." The Commission then ordered Alternative 1 to be put into effect temporarily and opened the rate structures issue for reconsideration of whether Alternative 1 or some other structure would be more effective in reducing the inequality of rates of return. On April 19, 1979, the Commission expressed dissatisfaction with the record, ordered PECO to submit additional information suggesting that other alternatives "be developed which might strike a middle ground balance between the Commission-ordered rate design" and Alternative 1. PECO then suggested as a possibility proposed Rate PD and HT tariff sheets appearing in its later rate case filed as Supplement No. 6 at R.I.D. 865 (test year ending March 31, 1980). Finally, by order entered April 7, 1980, the Commission adopted the Alternative 1 rate structure for use for revenues allowed in this proceeding.

Parke Towne argues that the Commission, by adopting Alternative 1, failed to accomplish its proclaimed goal to "eliminate to the extent reasonably

possible, variations in rates of return from customers" in Rate HT and PD classes. Park Towne insists that although Alternative 1 reduces the inequality between low-load factor users and median and high-load factor users, it actually increases the inequality between mid-demand and high demand users. Park Towne asks us to require the installation in this case of the rate structure proposed by PECO for the later (R.I.D. 865) case, which Park Towne contends is the only structure which is fair to it.

The question of reasonableness of rates and the difference between rates in their respective classes is an administrative question for the Commission to decide and this court's scope of review is limited. *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 512, 409 A.2d 446 (1979). Rate structure is a matter peculiarly within the Commission's flexible limit of judgment. *U.S. Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 173, 390 A.2d 865 (1978). The burden of proving that rates set by the Commission are discriminatory is on the customers challenging such rates. *U.S. Steel, supra*. To prove discrimination, Park Towne was bound to show that PECO was bent on collecting more than a reasonable rate from Park Towne (and other mid-demand customers) for the purpose of supplying a deficiency created by inadequate rates charged other customers. *Alpha Portland Cement Co. v. Public Service Commission*, 84 Pa. Superior Ct. 255 (1925). All that Park Towne here proved was that some other users in different demand classes pay lower rates than mid-demand HT users. We have repeatedly held that such differences do not establish the existence of unreasonable or discriminatory rates:

Differences in rates between classes of customers based on such criteria as the quantity of

electricity used, the nature of the use, the time of the use . . . , or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation.

*Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission*, 3 Pa. Commonwealth Ct. 184, 196-197, 281 A.2d 179, 186 (1971). *See also, U.S. Steel, supra; U.S. Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978). Park Towne's complaint on this account is without effect and we will affirm the Commission's April 7, 1980, order establishing the structure.

## B.   *Excess Capacity*

Park Towne contends that the Commission erred in rejecting the ALJ's recommendation of a $40 million downward adjustment of PECO's rate base for excess capacity. Park Towne's contention is based first on the fact that at the December 28, 1978, meeting which produced the order entered February 5, 1979, three of the five Commissioners allegedly orally declared their belief that an adjustment for excess capacity would be appropriate. Park Towne advances these comments as establishing that a majority of the Commission was favorable to an adjustment; and proposes that the Commission's later opinion and order not providing for any adjustment must be reversed. We disagree. Comments of individual Commissioners at meetings at which prospective adjudicatory action is under consideration are, of course, not binding on the individuals, much less the Commission. Park Towne does not charge the Commission or any member with want of fairness or impartiality; there is no suggestion of lack of due process in the Commission's

deliberations; and the impressionistic comments of the Commissioners at the public meeting are in the circumstances simply irrelevant. *Yellow Cab Co. v. Pennsylvania Public Utility Commission,* 32 Pa. Commonwealth Ct. 573, 381 A.2d 185 (1977).

Park Towne next asserts that because the Commission in its adjudication reproduces much of the ALJ's discussion of excess capacity, it was somehow bound to reach his result; and that its decision not to make a disallowance for excess capacity is without rational explanation and requires us to remand for further explanation. *West Penn Power Company v. Pennsylvania Public Utility Commission,* 33 Pa. Commonwealth Ct. 403, 381 A.2d 1337 (1978).

The ALJ's writing reproduced by the Commission was primarily a general statement of facts and certain legal concepts and by no means compelled a disallowance for excess capacity. The Commission expressed its awareness of problems faced by utilities in constantly having to tailor capacity to demand, caused by, *inter alia,* the increasing duration of construction periods and the enormous size of modern base load units, and wrote: "While we are acutely aware of and concerned with the financial burden which true 'excess capacity' might impose upon rate payers, we are unwilling to make any adjustment based upon alleged 'excess capacity' based upon the record in this proceeding." As indicated by its use of the adjectives "true" and "alleged" with the term "excess capacity", the Commission may have concluded that PECO had established that the property it asked to be included in rate base was used and useful in rendering service and that this evidence, not that adduced by opposing parties had preponderated. *UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980).

"What constitutes used and useful utility property is committed to the discretion of the Commission." *Bell Telephone Co. v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 629, 408 A.2d 917, 925 (1979). "In the area of adjustments to rate base, the Commission has wide discretion." *UGI,* 49 Pa. Commonwealth Ct. at 79, 410 A.2d at 929. We affirm the Commission's order declining to adjust rate base for asserted excess capacity.

## C. *Interest Expense Adjustment*

On February 21, 1979, Park Towne filed a Petition for Reconsideration of the Commission's February 5, 1979 order seeking that $1,147,000 be deducted from the allowance for federal taxes because the Commission had failed, in computing taxes, to include as an expense to PECO the interest on debt which would be attributable to the approximate $40 million which the ALJ had removed for excess capacity but which the Commission had restored.

The Commission agreed that the putative federal tax obligation was understated by $1,249,000 and that if an adjustment were made revenue requirements would be reduced in the same amount. The Commission declined to make any adjustment because (1) PECO had pointed out other computation errors indicating adjustments which would increase revenue requirements by $1,400,000 and which the Commission likewise refused to make; and (2) because the capital structure component had been rounded to an even 8%, and if the lower figure of 7.92% advocated by some parties had been adopted the figure in contention would be lowered by $1,036,000. The Commission concluded, in denying the Petition, that "the requested adjustment urges a degree of precision which is unwarranted." We agree.

## II.  PECO's Appeal

*A.  Reduction in Salem Unit No. 1 Construction Cost*

In May, 1968, PECO, together with Public Service Electric and Gas Company of New Jersey (PSE&G), Atlantic City Electric Company and Delmarva Power and Light Company, executed an agreement to jointly construct two 1090 megawatt nuclear generating units to be located in Salem, New Jersey. By this agreement PSE&G was primarily responsible for the design, construction and operation of the units. The first of these light water nuclear reactors, Salem No. 1, went into commercial operation on June 30, 1977. On the basis of its 42.59 per cent ownership share of the estimated $1.2 billion project (including both units) PECO requests that Salem No. 1 and designated parts of the plant common to both units be included in its rate base at a value of $287 million.

After Salem Unit No. 1 was completed, at the instance of the Consumer Advocate and his New Jersey counterpart, Theodore Barry and Associates, a private consulting firm, conducted a so-called audit of PSE&G's construction practices. On the basis of Barry's report the Administrative Law Judge and the Commission concluded that PSE&G imprudently managed the construction of Salem No. 1, that PECO failed adequately to monitor PSE&G, that $10.5 million of PECO's share of the Salem No. 1 expenditures "would not have been made had prudent management been exercised" and that $10.5 million should be eliminated from rate base.

We agree with the Commission that PECO's customers are not required to reimburse the utility, through rate charges, for expenditures imprudently made. As the Supreme Court wrote in *Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Co.,* 492 Pa. 326, 340, 424 A.2d 1213, 1220

(1981), quoting *Ben Avon Borough v. Ohio Valley Water Co.*, 260 Pa. 289, 309, 103 A. 744, 750 (1918):

The original cost of the property is not to be taken as controlling [in the ascertainment of the fair value of a utility's property for ratemaking purposes], for there may have been extravagance in purchasing, or bad management. . . .

The Barry report lends sufficient support to the conclusion that some of the Salem No. 1 construction costs exceeded those which PSE&G should have achieved through the exercise of prudent management. Specifically it identifies five categories of management practices which, in the authors' opinion, could have been improved by PSE&G. The construction cost savings that would have resulted from the use of what the authors term "preferred management practices" are also estimated. The estimated savings are then divided into those designated as "hard savings" and those designated as "soft savings." PECO's share of the hard savings attributable to the failure to properly manage the construction of Salem No. 1 is estimated to be $5.9 million and PECO's share of the soft savings is estimated to be $15.0 million. The Commission arrived at the ordered $10.5 million reduction in the cost of Salem No. 1 by choosing "the approximate midpoint between [the estimated figures for hard and soft savings]."

PECO challenges this aspect of the Commission's order on the ground that the cost reduction includes amounts not attributable, even by the terms of the Barry report, to "improvidence or other bad management" on the part of either PSE&G or (by some principle of joint or vicarious liability) to PECO. It is conceded by the Commission that in the absence of such improvidence or bad management or other wrongdoing in the construction of Salem No. 1 all costs actually incurred should be considered in determining

the value of the nuclear plant for the purpose of fixing just and reasonable rates. *Pennsylvania Power & Light Co. v. Public Service Commission,* 128 Pa. Superior Ct. 195, 216-217, 193 A. 427, 433-434 (1937). *See also, Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 318, 88 A.2d 59, 66 (1952).

To repeat: The Commission arrived at the $10.5 million figure simply by choosing, without further explanation, one-half of the total of hard and soft savings as estimated by Barry Associates. Such a composite judgment is inherently ambiguous; and it makes it impossible for us to determine which of the many cost items, estimates and assumptions contained in the report were thereby accepted by the Commission and which were rejected. *See West Penn Power Co.,* 33 Pa. Commonwealth Ct. at 406, 381 A.2d at 1339. But we may not in reviewing the PUC's orders assume duties and perform functions committed to the Commission, such as the weighing of evidence and the drawing of factual inferences. However, we may not abdicate our special duty to provide meaningful appellate review of the Commission's determinations. As we will show in some detail, it is unclear whether the estimated soft savings contained in the Barry report were intended by definition or in fact to represent costs that could have been avoided through the use, by PSE&G, of prudent management practices. In addition, several items contained within the soft savings and involving a large percentage of the total are clearly unrelated to any managerial imprudence. Therefore, we are compelled to reverse the Commission's Order and to remand the record for a description of the considerations based on the record which led it to accept as the cost of imprudence exactly one-half of the total, made up of numerous separate items, of both hard and soft savings appearing in the Barry report. *Cf. Pennsylvania Gas and Water Co. v. Penn-*

*sylvania Public Utility Commission,* 33 Pa. Common-
wealth Ct. 143, 149, 381 A.2d 996, 1000 (1977), *reversed
on other grounds.*

The report describes the distinction between hard
and soft savings as follows:

> The 'hard' impact reflects the minimum cost
> savings which PSE&G management should have
> attained if it had practiced accepted manage-
> ment practices. While the 'soft' impact reflects
> the maximum cost savings attainable if all ac-
> tivities had been performed effectively through-
> out the project.

It is reasonable and within the factfinding function
of the Commission to infer managerial imprudence
from testimony quantifying "savings which PSE&G
*should have attained* if it had practiced accepted man-
agement practices." (Emphasis added.) However, no
such normative implications are present in the Barry
definition of soft savings. It seems to us that "savings
attainable if all activities had been performed effec-
tively throughout the project" is not compatible with
any notion of imprudent management when common
experience and, indeed, discussion in the Barry report
itself, tells us that construction activities are often
"performed ineffectively" as a result of things other
than imprudent management. For example, the Barry
report emphasizes the effect on performance of a
lengthy pipe fitters' strike and other items of mis-
chance, possibly the cause of much of the soft savings.

This latter point is clearly expressed in the re-
port's discussion of the source and nature of the esti-
mated soft savings. The largest single item of poten-
tial soft savings in the construction of Salem No. 1
($21 million out of a total soft savings of $45.2 mil-
lion) is attributed in the report to failings in PSE&G's
"work force utilization." Nevertheless, the audit con-
tains the following summary of findings and conclu-

sions with respect to PSE&G's work force management practices during the course of the construction of Salem No. 1:

> Work force management functions were performed well at the project level. However, opportunities existed to improve the performance of work force management evaluation and control functions at the supervisory level.

In explaining these opportunities for improved supervision the report presents a chart in which work force management functions are divided into five general categories and eighteen specific elements. As to each of the eighteen elements PSE&G is assigned a grade for its performance at the project and supervisory level: a total of thirty-six grade assessments. The possible grades are defined as follows:

> A = performed effectively

> B = performed satisfactorily, but could be improved

> C = not performed effectively[1]

Since PSE&G receives a "C" grade in only one of the thirty-six elements (having to do with field reports on productivity), it is clear that the $11.4 million difference between the hard and soft savings attributable to failings in work force management must result from the inclusion in soft savings of construction costs that might have been reduced if PSE&G had altered managerial practices which were graded "performed satisfactorily, but could be improved." Obviously, to the degree that PSE&G performed effectively and got A's or satisfactorily and got B's, it was not guilty of imprudent management.

---

[1] The grading schema is elsewhere defined as follows:

A = activity performed satisfactorily

B = performance of activity could have been improved

C = performance of activity should have been improved

The second largest component of potential soft savings (which, together with failings in work force utilization, account for nearly 80% of the total) is in the area of "rework", that is, construction tasks which must be redone for various reasons including human failure, changes in federal design regulations and engineering errors. As described above, the performance of PSE&G in minimizing the necessity for rework was evaluated by comparing the management techniques actually used with "preferred management practices." In those instances where the preferred practice was not used by PSE&G the report presents an estimate of the resulting increase in construction costs and the aggregate of those increases is reflected in the estimated total potential hard and soft savings. However, it is clear from the testimony of James O. Love, a manager of Theodore Barry and Associates and co-author of the report, that the denomination of a particular management practice as preferred does not imply that PSE&G's use of another technique was imprudent or unreasonable. For example, Mr. Love testified as follows:

A: . . . It is also my observation that a large percentage of rework is due to interference from various piping systems, conduits, things of that nature, valves, and I think there has been a very rapid evolution in the state of the art in identifying these interferences and eliminating them prior to going into the field and encountering them after the fact, so to speak.

. . . .

Q: Now, I believe one of the preferred practices which it is indicated in your report which could go a long way toward reducing rework caused by construction interference is the

use of a mathematical model to predict when interference might occur. Is that not correct?

A: Yes. We were happy to point out that this mathematical model was an innovation, it is a current state of the art development, something that really was not available from the beginning of the Salem project, but one which should cut down the rework, for example, on Unit 2, and on Hope Creek considerably, if applied successfully.

Q: And I take it in your comment, this is an innovation that Public Service has participated in and is currently employing in its construction activities?

A: That is correct.

Obviously, the discovery of innovative management techniques not available during the construction process does not by itself render the conduct of the managing utility unreasonable or the cost of construction extravagant.

Moreover, in calculating the soft savings attributable to the possibility of decreased rework the report expressly "[a]ssume[s] all $12 million of labor costs were correctable . . ."; an assumption Mr. Love admitted on cross-examination was not based on fact because rework was caused by many things other than fault of management such as, notably, changes in the Nuclear Regulatory Commission's regulations. Mr. Love described the assumption as intended only to establish an upper limit on potential cost savings and to correct for any possibility that the amount of rework had been understated.[2]

---

[2] There is considerable evidence contained in the audit that PSE&G is, in fact, an industry leader in the minimization of construction rework. For example, the following assessment appears at Page 74 of the report:

In conclusion, no evidence other than that contained in the Theodore Barry and Associates' report was adduced challenging the propriety of the inclusion of actual construction costs of Salem No. 1 in rate base. As the New Jersey Board of Public Utilities found in rejecting the Theodore Barry audit as evidence of mismanagement on the part of PSE&G "the major portion of the audit supports PSE&G's position that it constructed the Salem facility in a reasonable and prudent manner." Indeed the audit's overall assessment of PSE&G's management of the construction project lends scant support to the charges of malfeasance:

> Overall, PSE&G recognized the need for and made appropriate moves toward implementing an organization and a level of management control appropriate for today's large and complex power stations construction projects. PSE&G's tradition of designing its own power plants in the past provided perspective and experience in this regard. While changes that were instituted by PSE&G provided benefits to the Salem project, implementation of certain other methods, practices, procedures, systems and organization would have contributed to minimizing costs of the Salem project. . . .

Therefore, insofar as the Commission's Order excludes from the Salem Unit No. 1 cost figures $10.5

PSE&G made other decisions that increased capital costs, based on prior experience but, without specific economic analyses. An example is their selection of cables having a good balance of electrical, radiation, and flame retardant characteristics. Although NRC regulations and industry standards at the time the cables were purchased did not require these same quality characteristics, the regulations and standards in effect at present do require cables similar to those selected by PSE&G. Other utilities that purchased what appeared to be less expensive cables have incurred costly retrofit charges.

million of costs incurred by PECO, it is reversed and we will remand for findings and conclusions on this issue.

## B. *Additional AFDC for the Salem Unit*

At the time PECO filed Supplements Nos. 72 and 73, Salem No. 1 had gone into service so that the Allowance for Funds used During Construction (AFDC) could not be accrued, but no return or annual depreciation could be received by PECO on capitalized AFDC accruals because the Salem unit had not yet been included in rate base, and could not be until the resolution of the rate case. By its September 26, 1977, order, the Commission allowed PECO to continue to accrue "on its books" AFDC on PECO's share of Salem No. 1 and the plant in common with Salem No. 2 for the period July 1, 1977, to December 31, 1977. According to accounting principles, such AFDC would be charged to an income account and would therefore be treated as earnings. It appears also that PECO needed to increase its reportable earnings in order to improve its bond coverage and the Commission asserts that it authorized the continued accrual as interim relief only to assist PECO with this problem.

After the September 26, 1977, order, PECO requested an opinion of the Chief Accountant of the Federal Power Commission (now the Federal Energy Regulatory Commission) as to whether the accounting of such AFDC as an expense would be permissible under the FPC System of Accounts in view of the fact that the Salem unit would be in operation during the accrual period. The FPC replied that any AFDC accrued after the inservice date of the Salem unit would not be permitted in PECO's accounting.

The ALJ in his recommended decision on interim relief found that the attempt by the Commission's September 26, 1977, order to provide immediate relief

by way of an increase in PECO's reportable earnings had been frustrated and suggested interim dollar rate relief in the amount of $32,500,000 on an annual basis. On February 24, 1978, the Commission, determining that 2.4 times bond coverage was that which was required by PECO, found that an increase in revenues at an annual rate of $11.883 million would increase PECO's indenture coverage to 2.4 times and accordingly gave PECO $11.883 million as interim relief.

PECO claimed, and still claims, that the Commission intended by its September 26, 1977, order to allow PECO to include the $8.493 AFDC accrued after the unit went in service in its rate base. The Commission explained in its February 5, 1979 final order that it refused to include the $8,493 million of AFDC in rate base as capitalized earnings because: "At the time of our September 26, 1977, order . . . we suffered under the mistaken belief that allowing such accrual . . . would provide a form of reportable earnings. Such was not to be the case." At the same time the Commission made it clear that the $11.883 million interim dollar rate relief granted on February 24, 1978, was not a supplement to the AFDC accruals but a substitute for them as evidenced by the dollar relief being calculated by the Commission to provide the exact requisite indenture coverage. Of course, we must give great deference to the Commission's interpretation of its own orders. *See, Purolator Security, Inc. v. Pennsylvania Public Utility Commission,* 32 Pa. Commonwealth Ct. 175, 378 A.2d 1020 (1977).

Further, if PECO's interpretation were effected, the $8.493 million added to rate base would produce an additional future revenue requirement, over the life of the Salem unit of approximately $40 million. As it observed in its brief on this appeal, the Commission, which was attempting to deal with an interim rate relief problem, could hardly have intended to burden the

rate payers in future years in the amount of approximately $40 million in order to give PECO $8.493 million in earnings in 1977.

The Commission's denial of PECO's claim to include in rate base $8.493 million from the AFDC accrued between July 1, 1977, and December 31, 1977, is affirmed.

The Commission's action, by its order of February 5, 1979, disallowing the amount of $10.5 million of Philadelphia Electric Company's share of the cost of constructing Salem Unit No. 1 in rate base is reversed and the record is remanded for findings, conclusions and a disposition of this issue consistent with this opinion; the Commission's order of February 5, 1979, is otherwise affirmed; the order of April 7, 1980, is affirmed.

### Order

And Now, this 17th day of August, 1981, it is ordered that the Commission's action, by its order of February 5, 1979, disallowing the amount of $10.5 million of Philadelphia Electric Company's share of the cost of constructing Salem Unit No. 1 in rate base is reversed and the record is remanded for findings, conclusions and a disposition of this issue consistent with this opinion; the Commission's order of February 5, 1979 is otherwise affirmed; the order of April 7, 1980 is affirmed.