Pennsylvania Retailers' Associations, General Electric Company, Westinghouse Electric Corporation, Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Office of Consumer Advocate et al., Intervenors

Bethlehem Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Office of Consumer Advocate et al., Intervenors.

Argued April 7, 1981, before President Judge CRUMLISH, JR. and Judges MENCER, ROGERS, CRAIG and PALLADINO.

*Edward J. Riehl,* with him *Robert H. Griswold, Mc-Nees, Wallace & Nurick,* for petitioners.

*Bohdan R. Pankiw,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

*Daniel J. Whelan,* with him *John P. Fons* and *James B. Ginty,* for intervenor, The Bell Telephone Company of Pennsylvania.

*Daniel Clearfield,* Assistant Consumer Advocate, with him *Walter W. Cohen,* Consumer Advocate, for intervenor, Office of Consumer Advocate et al.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., February 8, 1982:

In this consolidated appeal,[1] we are asked to set aside an order of the Pennsylvania Public Utility Commission (Commission) entered on April 21, 1980, allowing a $77.3 million increase for business telephone services. Intervenor, Bell Telephone Company of Pennsylvania (Bell) has filed a motion for partial dismissal of the petition alleging that certain issues presented by the petitioners were not raised below.

On December 12, 1978, Bell filed tariff provisions, with the PUC, designed to generate $156 million in

---

[1] Petitions for review were filed by Pennsylvania Retailers' Association, General Electric Company, Westinghouse Electric Corporation and Bethlehem Steel Corporation. Intervenors include the City of Philadelphia, the Manufacturers Association of Beaver County, the Bell Telephone Company of Pennsylvania, and the Office of the Consumer Advocate.

additional revenues. The increase, targeted at all classes of service, was to be implemented evenly over the subsequent two-year period. Several complaints were filed against the tariff provisions. On January 10, 1979, the Commission adopted its initial order which suspended the tariff and began its investigation into the legality of the proposed tariff revisions.

At the same time the Commission adopted its initial order, it gave Bell an option of pursuing its proposed tariff or filing alternative tariff revisions designed to produce $77.3 million that would become effective on sixty days' notice subject to investigation and refund, and cancellation of the December 12 tariff revisions. The Commission's order contained certain guidelines for the alternative tariffs to be filed on or before January 22, 1979:

(1) The alternative tariff provisions would produce revenues allowing Bell to earn a rate of return not greater than 9.65%.[2]

(2) To offset increases in rates only for those vertical business services[3] designated in two schedules attached to the order. Schedule A, Competitive Services—Equipment & Systems for Flexible Tariffs, and Schedule B, Non-Competitive Offerings—Not Sufficiently Compensatory.

(3) The services "subject to competition"[4] were to be flexibly priced so long as the floor and ceiling rates for those flexibly priced services "each will re-

---

[2] This rate of return (9.65%) was the amount allowed by the Commission in Bell's preceding rate case.

[3] Vertical business services consist of telecommunications systems primarily utilized by the business community. They include such services as WATS lines, KEY and COM-KEY systems, PBX, Centrex, etc.

[4] This term refers to those services which are offered by companies other than Bell and, thus, are subject to competitive pressures and cross-elastic markets.

sult in positive revenue contributions from the service offering. ..."

On January 22, 1979, Bell filed the alternative tariff provisions. After hearings and a report by an administrative law judge (ALJ) the Commission voted to effectuate the tariff revisions on March 23, 1979, subject to investigation and refund. An investigation into the tariff revisions commenced in April of 1979 with hearings held through August. On November 5, 1979, and subsequent to the hearings, the ALJ found insufficient evidence to sustain the actual competitiveness of the services listed in Schedule A as "Competitive Services," rejected Bell's flexible-pricing tariffs and found as a matter of fact and law that Bell's tariff revisions were "grossly discriminatory."[5]

By order adopted April 18, 1980 and entered April 21, 1980, the Commission rejected the recommended decision of the ALJ and found the alternative tariff to be just and reasonable.

Petitioners, by way of their petitions for review, have launched a broad-sided attack against the order of the Commission as it was finally adopted and the manner by which it was adopted. Specifically, the petition delineates four areas of complaint:

(1) The Commission, allowing Bell to implement profit maximization, flexible pricing rates for selected business services, has engaged in de facto deregulation prohibited by the Code.

(2) Rates set under profit-maximization, flexible pricing discriminate against customers of vertical business services in favor of basic exchange services.

---

[5] Apparently, the Administrative Law Judge found that, because the entirety of the general rate increase was to be absorbed by vertical business services, "discrimination exists between local exchange service for which no increases were proposed and the services, for which increases were proposed. ..."

(3) Due process of law was denied petitioners by the very way in which the proceedings were structured.

(4) The reversal of the Administrative Law Judge by the Commission was unaccompanied by evidentiary analysis or detailed findings of fact and thus is inadequate. Bell has filed a motion for partial dismissal of certain questions raised by the petitioners that allegedly were either not properly preserved for review or not ripe for decision. We find no basis for that motion and shall consider the petitioners' complaint seriatim.

### Abdication of Regulatory Responsibility

Petitioners argue that Bell's flexible pricing, profit-maximization scheme for vertical business services is a de facto deregulation of the rates for those services. We disagree.

The telecommunications industry has been in a period of flux because it operates in both the competitive and monopolistic arenas. *See Carterfone,* 13 FCC 2d 420, *recon. den.,* 14 FCC 2d 571 (1968). In order that Bell be allowed to react to changes in its competitive market and maintain a maximum level of revenue contribution, the Commission has allowed rates for competitive services to be flexibly priced. Though the petitioners question the existence of competition in those services listed by Bell in Schedule A as "subject to competition," we are convinced both by the record and prior case law, that competition does exist in these services. *See Executone of Philadelphia, Inc. v. Pennsylvania Public Utility Commission,* 52 Pa. Commonwealth Ct. 74, 415 A.2d 445 (1980).

Flexible pricing is an approved rate-making scheme utilized by Bell whereby Bell submits to the

Commission, along with the necessary supporting data, floor and ceiling rates for services deemed to be competitive. Both the floor and ceiling rates must generate sufficient revenue to cover the direct costs of the service and contribute to the costs of Bell's basic exchange service. The objective of flexible pricing is to allow Bell maximized profits by charging a rate in a range of rates approved previously.[6] In this rate schedule, Bell's use of long-run incremental analysis (LRIA) as the appropriate rate proposal methodology has been reapproved. This Court, in *Executone of Phila.,* quoting from the Commission's opinion in that case, stated:

----

[6] It should be noted that profit maximization does not result in the highest rate to the customer. The object of profit maximization is to attain the greatest net contribution thus keeping basic exchange service rates as low as possible.

> According to the basic principles of economics, total incremental revenues exceed total incremental costs by the greatest possible amount when the additional revenue generated from the sale of the last unit of the service is just sufficient to cover the additional costs incurred by producing and selling that last unit. More precisely, according to economic principles, the price that generates the largest practical net contribution for all units of a competitive or vertical service is the one that sets marginal revenues equal to marginal costs for the very last unit of service. . . . Long-run incremental analysis (LRIA) is a real world approximation of those economic principles.
>
> If the Company were to charge a higher price, it would market fewer units of the service and, thereby, the net contribution would decline. Similarly, if the Company were to charge a lower price, it would market more units of the service. However, since the additional revenue is less than the additional cost, the net contribution would decline again. Theoretically, there are no circumstances under which the Company can move away from the price and quantity combination which optimizes the net contribution and be made better off.

Respondents' statement no. 5, Frank J. Alessio, R. p. 159.

'[t]here is no single correct cost study or methodology that can be used to answer all questions pertaining to costs; there are only appropriate and inappropriate cost analyses depending upon the type of service under study and the management and regulatory decision in question.'

*Id.* at 79, 415 A.2d at 448. We stated further that in the area of competitive rate setting, LRIA is "an appropriate methodology by which to demonstrate the reasonableness of the proposed rates; it constitutes substantial evidence in support of the Commission's decision that the proposed rates were just, reasonable, and not in violation of the law." *Id.* at 79-80, 415 A.2d at 448.

In the competitive market area, Bell is forced to adapt its rates to the market for two reasons: (1) if the rates are too high, the customers simply secure the services of the competition; (2) if the rates are so low as to preclude a positive contribution to revenue, Bell would be liable in anti-trust for predatory pricing. Consumers are thus fully protected from unreasonable pricing both by marketplace forces and the regulatory process.

As to the assertion that flexible pricing is de facto deregulation, Section 1307(a) of the Public Utility Code (Code),[7] entitled "Sliding scale of rates; Adjustment," provides in part:

Any public utility . . . may establish a sliding scale of rates or such other method for the automatic adjustment of the rates of the public utility as shall provide a just and reasonable return on the fair value of the property used and useful in the public service, to be deter-

---

[7] 66 Pa. C. S. §1307(a).

mined upon such equitable or reasonable basis as shall provide such fair return. A tariff showing the scale of rates under such arrangement shall first be filed with the commission, and such tariff, and each rate set out therein, approved by it. The commission may revoke its approval at any time and fix other rates for any such public utility if, after notice and hearing, the commission finds the existing rates unjust or unreasonable.

The Petitioners' assertion that the process by which Bell and the Commission determine rate levels is an abandonment of the regulation dictated by the Code is unfounded. The Commission has adopted what it has determined to be a reasonable and efficient system of rate regulation necessarily different perhaps from other rate-making procedures, but forced to be so by the exigencies of regulating a utility engaged at least partially in the competitive marketplace.

### Rate Discrimination

Section 1304 of the Code[8] provides in part that:

No public utility shall, as to rates, make or grant unreasonable preference or advantage to any person, corporation . . . or subject any person, corporation . . . to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service. . . . This section does not prohibit the establishment of reasonable zone or group systems, or classifications or rates.

---

[8] 66 Pa. C. S. §1304.

Petitioners maintain that the use of profit maximization flexible-pricing for vertical business services results in unreasonable differences in those rates as opposed to those allowed for basic exchange services. It is asserted that discrimination exists because "of an extreme differential in profitability of services. . . ." (petitioners' brief, p. 22) The essence of the petitioners' discrimination argument is that a greater return is demanded from vertical business services than from basic exchange services thus in effect having the users of vertical business services subsidize basic exchange services. It is this residual pricing differential in the rates for these services that the petitioners' claim demonstrates such an unreasonableness as to run afoul of Sections 1301 and 1306 of the Code.[9]

There is no disagreement that vertical business services and basic exchange services constitute two different reasonable classes of services and, as such, are allowed by Section 1304 of the Code. There is only the requirement that "the rates for one class of service shall not be unreasonably prejudicial and disadvantageous to any other class of service." *Zucker v. Pennsylvania Public Utility Commission*, 43 Pa. Commonwealth Ct. 207, 214, 401 A.2d 1377, 1382 (1979). We conclude they are not.

In *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission*, 3 Pa. Commonwealth Ct. 184, 196, 281 A.2d 179, 186 (1971), we held:

> There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes

---

[9] 66 Pa. C. S. §§1301, 1306.

of customers . . . are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation. Rate structure, which is an essential, integral component of ratemaking, is not merely a mathematical exercise applying theoretical principles. Rate structure must be based on the hard economic facts of life and a complete and thorough knowledge and understanding of all the facts and circumstances which affect rates and services; and the rates must be designed to furnish the most efficient and satisfactory service at the lowest reasonable price for the greatest number of customers, i.e., the public generally.

The residual pricing of basic exchange services is within the Commission's "flexible limit of judgment." *United States Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 205, 390 A.2d 849, 855 (1978).

As we observed in *U.S. Steel,* this Court will not, with very limited exception, delve into the rate making process utilized by the Commission, for

[t]he establishment of a rate structure is an administrative function peculiarly within the expertise of the Commission . . . the reasonableness of rates and the difference between rates are factual questions for the Commission whose findings must be upheld if supported by competent evidence.

*Id.* at 211, 390 A.2d at 857.

Though the petitioners maintain that they are forced to pay very high rates to support basic exchange services, we are convinced that the record indicates otherwise. We will not disturb rates set

by the Commission when, as here, such are supported by competent evidence.[10]

## Due Process Consideration

Petitioners contend that they were denied due process of law because the burden of proof placed on the utility by Section 315(a) of the Code[11] was shifted to the petitioners by the Commission's orders of January 10 and March 22, 1979. The petitioners contend that the Commission's order allowing for an alternative rate increase prior to investigation predisposed the Comission to accept the existence of competition in certain service areas and the concept of flexible pricing. The Commission's supposed predisposition, Petitioners argue, in effect shifted the burden of proving the justness and reasonableness of these rates to the user of vertical business services.

We are unconvinced by petitioners' argument that allowing these alternative rates to go into effect in any way shifted the burden of proof. After allowing the alternative tariffs to be filed, the Commission conducted hearings to determine if they conformed to the January 10th order. Having found conformance, the Commission allowed those rates to become effective *subject to further examination and the possibility of refund.*

---

[10] Petitioners further assert that there also exists discrimination between today's users of vertical business service and tomorrow's as a result of marketplace changes. We are nonplussed by this argument and dismiss it without further discussion.

[11] Section 315 provides in part:

(a) Reasonableness of rates.—

In any proceeding upon the motion of the Commission, involving any proposed or existing rate of any public utility, or in any proceedings upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility. 66 Pa. C. S. §315.

The action by the Commission in suspending or not suspending proposed tariff does not denote approval or disapproval of a tariff. There is no shifting of the burden of proof when the Commission in its discretion permits a tariff to become effective prior to investigation. In fact, in this case, the Commission provided greater due process than necessary for ''[i]t is well settled that the PUC without notice or hearing may permit rates to become effective or suspend them pending decision concerning their lawfulness.'' *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 55 Pa. Commonwealth Ct. 177, 184, 423 A.2d 454, 457 (1980), *see Baker v. Pennsylvania Public Utility Commission,* 14 Pa. Commonwealth Ct. 245, 322 A.2d 735 (1974). In addition, it must be remembered that customers are protected from any unreasonable or unjustified rate increases by the refund process.[12] Thus, our review of the record leads us to conclude that petitioners' assertion that their due process rights have been violated is without merit.

### Rejection of the ALJ's Decision

The petitioners' final complaint concerns the weight to be given the findings of an Administrative Law Judge. The ALJ found the tariff revisions and accompanying methodology filed by Bell to be ''grossly discriminatory'' and unreasonably preferential. Petitioners assert that the Commission ''may reject and reverse [the ALJ's] finding of facts only after substantive analysis and explanation of the error of the Administrative Law Judge and a detailing of evidence in support of the newly found fact.'' (peti-

---

[12] In fact, the April 21st order of the Commission applies refund credits to services contained in Schedule B, ''Non-Competitive Offerings—Not Sufficiently Compensatory.'' (Commission's order, p. 31b.) Also, *see* 66 Pa. C. S. §1312(a).

tioners' brief at p. 42). The petitioners further assert that "[t]he Commission has not satisfied its burden of disproving the propriety of the Administrative Law Judge's factual conclusions, but rather has substituted its own without properly demonstrating the propriety of the substitutions." (petitioners' brief at p. 49).

Again, we disagree with the petitioners' assessment of the Commission's reviewing powers and our scope of review. As we have said earlier, an order of the Commission will be upheld by this Court when supported by substantial evidence. *United States Steel.* We have already held that the order of the Commission was based on substantial evidence and shall be affirmed notwithstanding the contrary view of the Administrative Law Judge.

The decision of the Administrative Law Judge, though perhaps eminently reasonable, may always be superseded if a contrary decision is reached by the Commission based on substantial evidence. We have previously decided in *G. G. & C. Bus Co. v. Pennsylvania Public Utility Commission*, 42 Pa. Commonwealth Ct. 384, 400 A.2d 941 (1979), that Section 335(a) of the Code gives the Commission powers far greater than those espoused by petitioners:

> The statute . . . provides that the Commission when it reviews the initial decision of a presiding officer 'has all the powers which it would have in making the initial decision. . . .' A broader grant of power to the Commission in the disposition of initial decisions in case it chooses to review can scarcely be imagined. Therefore [Petitioners'] argument that the Administrative Law Judge's initial decisions could not be disregarded by the Commission is unacceptable.

*Id.* at 390, 400 A.2d at 944.

504

Thus, for the reasons stated in this Opinion, the April 21, 1980 order of the Commission is affirmed.

ORDER

Respondents' motion for partial dismissal is denied and the April 21, 1980 order of the Pennsylvania Public Utility Commission at Docket No. R-78120719, is affirmed.

Judges MENCER and PALLADINO did not participate in the decision in this case.