518 A.2d 600

MCI Airsignal of Pennsylvania, Inc. and RCCs of Pennsylvania, Inc., Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 11, 1986, before President Judge CRUMLISH, JR. and Judges CRAIG, MACPHAIL, BARRY and COLINS.

*Lloyd R. Persun, Shearer, Mette & Woodside,* for petitioners.

*Bohdan R. Pankiw,* Assistant Counsel, with him, *Kenneth L. Mickens,* Assistant Counsel, *Albert W. Johnson, III,* Deputy Chief Counsel and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Thomas L. Welch,* with him, *William L. Leonard, Richard D. Spiegelman, Jon C. Oplinger* and *Julie A. Conover,* for intervenor, The Bell Telephone Company of Pennsylvania.

OPINION BY JUDGE COLINS, December 3, 1986:

MCI Airsignal of Pennsylvania, Inc.,[1] a radio common carrier providing paging and mobile radio services to the public, and RCCs of Pennsylvania, Inc., a group

---

[1] MCI Airsignal of Pennsylvania, Inc. is a different entity from MCI Telecommunications Corporation, although both are owned by the same parent corporation.

of 27 such radio common carriers (RCCs, Collectively) seek review of an order of the Pennsylvania Public Utility Commission (Commission) which granted The Bell Telephone Company of Pennsylvania (Bell) additional intrastate annual operating revenues of $36,784,017, an increase of 2.03% in previously allowed revenues, and permitted Bell to charge the RCCs existing tariff rates for certain telecommunication services.

We shall consider solely that part of the Commission's order pertaining to the RCCs.[2] This Court's scope of review of a Commission order encompasses a determination whether an error of law was committed or whether the findings, determinations or order of the Commission are supported by substantial evidence. *Cohen v. Pennsylvania Public Utility Commission,* 90 Pa. Commonwealth Ct. 98, 494 A.2d 58 (1985).

### Factual Background

Prior to undertaking a discussion of the legal issues involved, we must detail the functional interrelationship of the telecommunication services at issue here. The RCCs use their own facilities in conjunction with services purchased from Bell to provide one-way paging and two-way mobile radio services to the public.

As an expert witness testified at hearings before the Administrative Law Judge (ALJ), a typical system operates as follows:

> To page someone, a caller anywhere on the telephone company's landline system dials a telephone number that has been assigned to a particular paging receiver (a 'beeper'). That call is routed by the telephone switched network to the central office (CO) serving the radio paging sys-

---

[2] A Commission motion to consolidate the instant appeal with an appeal filed on behalf of Bell from the same rate order was denied.

tem. A message is then sent from the CO over a dedicated trunk to the RCC's paging terminal. From the paging terminal, which is owned by the RCC, a signal is sent out to the RCC's radio transmitters. These transmitters then broadcast the signal which activates a specific pager within the broadcast range of the transmitters.

Bell provides the interconnection facilities necessary for the paging customers to receive calls from landline customers. These facilities comprise: (1) the channel connecting the telephone company's central office to the RCC's paging terminal, a connection provided by means of one or more Direct Inward Dialing Trunks (DID trunks); (2) the DID telephone numbers, the telephone numbers Bell customers call to activate specific beepers; and (3) the telephone company lines (R/T links) connecting the paging terminal and the radio transmitter. Bell provides these services to the RCCs, as well as to private branch exchange (PBX) and telephone answering service (TAS) customers, and itself uses these facilities to compete with the RCCs in certain paging markets. It is undisputed that Bell has a valid existing tariff in effect for these services. PBX and TAS customers are charged in accord with the tariff.

The RCCs had obtained these services from Bell under rates established pursuant to contract. On December 29, 1982, Bell notified the RCCs that the contract would be terminated as of January 1, 1984, the date of the reorganization of American Telephone and Telegraph (AT&T). On that date, Bell terminated the contract and thereafter charged the RCCs existing tariff rates for DID numbers while maintaining the previous contract rates for other services.

On January 22, 1985, Bell sought approval of a general rate increase calculated to yield approximately $325 million dollars in additional annual intrastate revenues

and which proposed to charge the RCCs tariffed rates for all services. In response to timely complaints filed by the RCCs and other parties, the Commission suspended the proposal pending investigation of Bell's existing and proposed rates and extensive hearings were conducted by an ALJ. The RCCs contended, in essence, that the tariff rates proposed by Bell were unjustified and that the appropriate rates were those defined by the previous contract between the parties, now terminated. The ALJ determined that "the RCCs [were] not so different from other customers [of Bell as to] require different tariff provisions" and the Commission affirmed that part of the ALJ's decision,[3] which determined that the existing tariff rates were proper for interconnection services provided to the RCCs.

Upon appeal to this Court, the RCCs contend that: (1) Bell failed to prove that the proposed rates were just and reasonable, in accord with Section 315(a)[4] of the Public Utility Code (Code), 66 Pa. C. S. §315(a); (2) the Commission's order was not supported by substantial evidence; and (3) the Commission's order was inconsistent with Commission decisions encouraging competition among utilities. The RCCs do not contest the level of the authorized revenue increase, nor do they contend that the existing tariff rates, as applied to other Bell customers for these same services, are unjust. Rather,

---

[3] The Commission reversed that part of the ALJ's determination which provided for continuing negotiation between the RCCs and Bell in an attempt to reach a mutually acceptable rate structure.

[4] Section 315(a) of the Code, 66 Pa. C. S. §315(a), provides that: "[i]n any proceeding upon the motion of the commission, involving any proposed or existing rate of any public utility, or in any proceedings upon complaint . . . the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility."

the RCCs submit that the existing tariff rates, as applied to them, are unreasonable, by virtue of the fact that they utilize these services in different fashion than do other Bell customers. We take the argument propounded by the RCCs to mean that the tariff rates, as applied to the RCCs, are discriminatory, and therefore, unlawful, pursuant to Section 1304[5] of the Code, 66 Pa. C. S. §1304. The RCCs request that we direct the Commission to incorporate the previous contract rates into a Bell tariff supplement designated solely for RCC interconnection and, further, demand that Bell be ordered to refund all payments made in excess of these contract rates since January 1, 1984.

## *Discussion*

The question of the reasonableness of rates and the difference between rates in their respective classes is an administrative question for the Commission. *Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 285, 433 A.2d 610 (1981). Rate structure is a matter peculiarly within the Commission's "flexible limit of judgment." *Id.* at 291, 433 A.2d at 614. The burden of proving rate structure discrimination falls upon the customer challenging those rates. *Sharon Steel Corp. v. Pennsylvania Public Utility Commission,* 78 Pa. Commonwealth Ct. 447, 468 A.2d 860 (1983). Mere differences in rates between classes of customers do not establish unreasonable discrimination, *United States Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978),

---

[5] Section 1304 of the Code, 66 Pa. C. S. §1304, provides that: "[n]o public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person . . . or subject any person . . . to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates. . . ."

and to prove discrimination, the RCCs were required to show that Bell was collecting more than a reasonable rate from the RCCs for the purpose of supplying a deficiency created by inadequate rates charged other customers. *Park Towne.* No such proof was here presented. Nor are we convinced that the RCCs utilize these subject telecommunication services in so varying a capacity from Bell's other customers as to justify a separate rate structure applicable solely to them.

The ALJ concluded that "the RCCs are not so different from other customers [as to] require different tariff provisions." Our review of the record fails to disclose usage differences justifying an independent and reduced rate structure for the RCCs. The RCCs contend that they are entitled to a reduced rate for DID numbers, those telephone numbers which activate specific beepers assigned by the RCCs to their subscribers, by virtue of the fact that they are "number intensive," that is, they use telephone numbers in greater quantities than do PBX and TAS consumers. These facts do not require that the RCCs be given a singular rate. A large volume of use of a utility's produce alone does not entitle the customer to a singular rate. *United States Steel; see also Carpenter v. Pennsylvania Public Utility Commission,* 141 Pa. Superior Ct. 447, 15 A.2d 473 (1940). Moreover, the record indicates that the DID number requirements of TAS customers fall between those in the PBX and RCC markets, so that we cannot find that the RCCs are unique in their use of DID numbers. Bell's costs in providing numbers are constant regardless of volume of use.

The RCCs also demand a singular rate for DID trunks and terminations and attack the accuracy of Bell's cost of service study submitted in support of the application of existing tariff rates to these services. The RCCs take issue with an alleged miscalculation involving "holding time," the measure of the amount of time

per call that a particular piece of telephone equipment is in operation. As RCC usage is characterized by a brief "holding time" relative to Bell's other customers, consistent with the short time required to utilize a paging device, the RCCs submit that they are entitled to a unique and reduced rate for this service. The record reveals that "holding times" vary widely among TAS, PBX and the RCCs. While the RCCs may indeed have the shortest "holding time," among Bell customers, they are not sufficently distinctive so as to warrant a singular rate. Moreover, "holding time" may vary with changes in technology. Finally, the RCCs attempt to establish their uniqueness by virtue of their use of the lines primarily for one-way traffic as opposed to the two-way traffic characteristic of telephone service capable of both receiving and originating calls and protest the tariff rate which effectively charges the RCCs for two-way service on a so-called "dial tone" line. The line provided by Bell is capable of two-way connection and the costs incurred by Bell in the installation and maintenance of these lines do not vary with the directional capacity of usage. It is our understanding that the RCCs' two-way mobile radio service requires "dial tone" lines and we cannot conclude that the tariff rate is inappropriate. Nor do we find that the RCCs have proven entitlement to a singular rate for R/T links.[6]

As we observed in *United States Steel,* this Court will not, with very limited exception, delve into the

---

[6] The RCCs submit that Bell failed to base its cost of service calculations for R/T links on "forward looking technologies" such as microwave, which technology is allegedly less expensive. Bell contends the studies were based on microwave, hardwire and fiber optic service, all of which technologies Bell utilizes in various locations. Bell suggests that, as microwave service is available from other suppliers, as the RCCs so concede, any dissatisfaction with the price of these services is properly remedied in the marketplace.

rate-making process utilized by the Commission. The record *sub judice* is complex and voluminous. We cannot conclude that the Commission erred as a matter of law in refusing to establish a separate rate structure for the RCCs, nor can we find the Commission likewise erred in uniformly applying existing tariff rates to similarly situated consumers. We find no authority in either the Code or contract law entitling the RCCs to the continuation of preferential, but terminated, contract rates. The ALJ rejected the RCCs' claim of entitlement to the reduced rates of the now-expired contract and stated that "Bell has taken the appropriate steps to terminate the old contractual relationship. No class of utility customers can develop a continuing right to special treatment." Indeed, the ALJ determined that the previous contract rates "seem to be too low." It is true that the application of existing tariff rates to services purchased by the RCCs subjects same to a substantial rate increase, ranging from 100-400% for respective services. However, we cannot avoid the conclusion that the observed rate increase results in large measure because the RCCs have benefited from an advantageous contract rate, now properly terminated.

We lastly consider the RCC's contention that the application of existing tariff rates to the interconnection services at issue here will enable Bell to utilize its monopoly supplier status to artificially enhance its competitive position in those markets within which it competes with the RCCs. It is undisputed that Bell offers comparable telecommunication services in certain markets, most notably in urban areas. The RCCs submit that Bell "failed to perform any competitive or market impact analyses to demonstrate that its proposed increases will not impair . . . competition" and that such omission is fatal to Bell's claim. However, our research fails to disclose authority burdening the utility with the perform-

ance of market analyses to determine the potential impact of a rate proposal on competition, as the RCCs suggest, pursuant to the facts of this case.

The RCCs submit that rate increases occasioned by the application of tariff rates will impair competition within the RCC market, a result that is inconsistent with Commission decisions furthering competition in those markets. The amount of competition which is best suited to serve the public interest is within the Commission's discretion. *Morgan Drive Away, Inc. v. Pennsylvania Public Utility Commission,* 101 Pa. Commonwealth Ct. 244, 515 A.2d 1048 (1986). "The assertion of an adverse impact, moreover, is predicated upon the assumption that business will be diverted to [Bell]." *Id.,* at 247, 515 A.2d 1050. While that outcome may well be forthcoming, nothing in the record indicates that such is the likely result. Nor is there evidence of record indicating that Bell's rates to subscribers were priced below cost. In fact, a representative of Bell testified that, in determining rates for its own mobile services, Bell imputed tariff rates for DID numbers, trunks and terminations and R/T links.

The ALJ in the instant matter expressed concern about "an unfair price squeeze which would tend to reduce or destroy competition" should the Commission deem applicable the existing tariff rate structure to RCC interconnection.[7] The decision of the ALJ may, of course, be superseded if a contrary result is reached by the Commission. *Pennsylvania Retailers' Associations v. Pennsylvania Public Utility Commission,* 64 Pa. Commonwealth Ct. 491, 440 A.2d 1267 (1982). We note that the Commission did not expressly address the RCC's

---

[7] The ALJ suggested that "Bell be required to relate RCC tariff contributions to its own radio common carrier rates."

concerns regarding market competition in its decision. However, the fact that this matter was considered and dismissed is implicit in the Commission's decision. We repeat that the questions raised by the RCCs concerning the reasonableness of rates and the differences between rates are factual questions for the Commission whose findings must be upheld if supported by competent evidence. *United States Steel.*

Having so found, the order of the Commission is affirmed.

### ORDER

AND NOW, December 3, 1986, the order of the Pennsylvania Public Utility Commission in the above captioned-matter is affirmed.