**CASS COUNTY ELECTRIC COOPERATIVE, INC.,
Appellant,**

v.

**NORTHERN STATES POWER COMPANY and North Dakota Public Service Commission, Appellees.**

Civ. Nos. 930333, 930356.

Supreme Court of North Dakota.

June 20, 1994.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for appellant; argued John D. Kelly; appearance by Pamela J. Hermes.

Zuger Kirmis & Smith, Bismarck, for appellee Northern States Power Co.; argued by Daniel S. Kuntz; appearance by James P. Johnson.

Charles E. Johnson (argued), Asst. Atty. Gen., Public Service Com'n, State Capitol, Bismarck, for appellee ND Public Service Com'n.

MESCHKE, Acting Chief Justice.

In these consolidated appeals by Cass County Electric Cooperative, Inc. (CCEC), from district court judgments affirming Public Service Commission (PSC) orders, we consider the validity of flexible tariffs with minimum/maximum rate ranges approved by the PSC that permit actual charges to be negotiated between Northern States Power Company (NSP) and its customers. We conclude

that the flexible tariffs are valid, and we affirm the judgments.

NSP is a utility regulated by the PSC. NSP owns and operates natural gas distribution systems in Grand Forks and Fargo, and also delivers electricity to customers in Fargo. CCEC is a rural electric cooperative that furnishes electricity to its members in eight North Dakota counties, including Cass County around Fargo.

In April 1992, NSP filed changes to its natural gas transportation tariff. NSP sought approval to negotiate actual charges for natural gas transportation service to its interruptible customers [1] at Grand Forks and Fargo who purchase their gas from others, under a flexible tariff within a range of minimum and maximum rates. The PSC allowed CCEC to intervene. In its decision, the PSC found: (1) the maximum rate is the approved rate otherwise available to large volume gas customers with interruptible service and is a reasonable rate; (2) the minimum rate exceeds NSP's direct incremental costs of providing the gas transportation service and is a reasonable rate; (3) CCEC's witness did not object to either the proposed minimum or the proposed maximum; (4) because the minimum and maximum rates are both reasonable, every rate between them is reasonable; [2] (5) NSP must compete with coal and fuel oil, and NSP customers use alternate fuels when it is economically favorable; (6) NSP credits part of its gas transportation profits to firm service customers; (7) "NSP prices its transportation service to each customer based on publicly available pricing indexes for the alternative fuel the customer is capable of using;" (8) "Flexible pricing of interruptible transportation service is common throughout the industry" and "does not constitute unreasonable discrimination;" and (9) prices set by competition benefit all NSP customers. The PSC concluded that NSP's proposed tariff changes were "lawful, just, reasonable, sufficient and are not unreasonably discriminatory," and, in March 1993, approved NSP's flexible tariff.

CCEC appealed. The district court affirmed the PSC order, reasoning:

> The statutory authority for establishing rates are found in Sections 49–02–03 and 49–05–06 of the NDCC. Essentially the Commission is empowered to supervise and establish rates that it finds just and reasonable. Section 49–04–07 of the code appears to allow the filing of flexible rate tariffs.

CCEC appealed to this court.

In May 1992, NSP applied to the PSC for an increase in its electric service rates in North Dakota. NSP included a proposed economic development tariff for flexible rates to be negotiated between NSP and customers engaged in economic development. The PSC allowed CCEC to intervene to oppose the flexible economic-development tariff. In its December 1992 order approving certain electric rate increases, the PSC found that NSP's proposed flexible economic-development tariff needed revision. NSP revised the flexible tariff and the PSC approved it

---

1. Interruptible customers are customers that have the ability to easily switch from natural gas to another energy source when economically advantageous to do so or when conditions require that their gas supplies be interrupted. As the court explained in *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981, 995 (D.C.Cir.1987):

> End users run the gamut both in size and in ability to use substitutes. At one end is the ordinary householder, who even in the intermediate run is limited to such expedients as installing better insulation, wearing more sweaters, or turning the thermostat down. At the other end of the spectrum are users that need only flick a switch to replace gas with oil. "[F]uel-switchable users ... can employ the cheapest fuel competing with gas and thus cannot be induced to pay more than the current competitive price." *Id.* at 1021.

2. CCEC's failure to object to either the minimum or the maximum in either case and the PSC's finding that the minimum and the maximum are both reasonable in both cases indicates that the range in each case constitutes a "zone of reasonableness":

> There is no suggestion in the report that the rates have been so reduced as to be less than compensatory. True they do not reach the maxima beyond which charges are excessive. On the other hand, they do not pass the minima beyond which charges are too low. A zone of reasonableness exists between maxima and minima within which a carrier is ordinarily free to adjust its charges for itself.

*United States v. Chicago, M., St. P. & P. Ry. Co.,* 294 U.S. 499, 506, 55 S.Ct. 462, 465, 79 L.Ed. 1023, 1029 (1935).

promptly. The approved flexible tariff authorizes negotiated rate incentives to new customers in NSP's service area who meet certain minimum energy use requirements or to existing customers who increase their energy use to those amounts, but only as to the increased usage. The minimum rate is NSP's incremental cost of providing service to the customer. The maximum rate is the PSC-approved full retail rate paid by other customers. The discounts are phased out over a period of five years. CCEC objected to the range, but not to either the minimum or the maximum. CCEC appealed. The district court adopted its opinion in the gas transportation case and affirmed the PSC order. CCEC appealed to this court.

■ The two appeals were consolidated. NSP contends that CCEC lacks standing to appeal the PSC's decisions because CCEC has not shown how it is factually aggrieved. In rejecting a standing challenge, the court in *Webster Groves Trust Co. v. Saxon*, 370 F.2d 381, 388 (8th Cir.1966), said:

> The Comptroller is also asserting that a competitor has no standing to object to lawful competition. With this rule we find no fault, but the banks surely have the standing to object to illegal competition. (Citations omitted.) Therefore, when a competitor believes he is being subjected to illegal competition owing to impropriety by the Comptroller, the courts should be open to hear and decide the alleged wrong. The trial court was vested with jurisdiction over the subject matter of this litigation.

CCEC intervened in these proceedings under NDCC 28–32–08.2, that authorizes an administrative agency to grant intervention to one who demonstrates that its "legal rights, duties, privileges, immunities, or other legal interests may be substantially affected by the proceeding." We believe that CCEC meets the three-part test formulated in *Application of Bank of Rhame*, 231 N.W.2d 801 (N.D. 1975), for determining who is a "party" for taking an appeal from an agency decision: CCEC was directly interested in the proceedings, it might be factually aggrieved by the agency's decision, and it participated in the proceedings. NDCC 28–32–15(1) says: "Any party to any proceeding heard by an administrative agency, ..., may appeal from the order." We conclude that CCEC had standing to appeal these PSC orders.

■ CCEC contends that the PSC's orders approving the flexible tariffs are "not in accordance with the law" and are beyond the PSC's scope of authority. *See* NDCC 28–32–19(1). "The Public Service Commission has only such powers as have been conferred upon it by the Legislature." *Grafton v. Otter Tail Power Co.*, 86 N.W.2d 197, 202 (N.D. 1957). NDCC 49–02–03 authorizes the PSC to supervise the rates of public utilities, and says that the PSC has the power to establish, adjust, and modify tariffs, rates and charges. This statute says that, if the PSC finds existing rates are "unjust, unreasonable, insufficient, unjustly discriminatory, or otherwise in violation of any of the provisions of this title," the PSC "shall fix reasonable rates." When a utility gives notice of a rate change, NDCC 49–05–06 authorizes the PSC to suspend the rate change. This section also authorizes the PSC to order a hearing where the PSC shall establish the rates "which it shall find to be just and reasonable." NDCC 49–04–07 directs:

> No public utility shall make or give any undue or unreasonable preference or advantage to any particular person ... in any respect whatsoever, nor subject any particular person ... to any undue or unreasonable prejudice or disadvantage in any respect. No public utility ... shall charge ... any person a greater or less compensation for any service ... than it charges ... any other person ... for doing a like and contemporaneous service under the same or substantially similar circumstances and conditions. Nothing in this chapter shall prohibit a public utility from entering into any reasonable agreement with its customers, consumers, or employees or from providing for a sliding scale of charges, unless the same is prohibited by the terms of the franchise or permit under which such public utility is operated. No such agreement or sliding scale shall be lawful unless and until the same shall be filed with and approved by the commission.

These statutes, enacted in S.L.1919, Ch. 192 and changed very little since, govern the agency's decision in this case.

 Leaving the manner and means of exercising an administrative agency's powers to the discretion of the agency, comparable to a municipality's exercise of its legislated powers, "implies a range of reasonableness within which [an administrative agency's] exercise of discretion will not be interfered with or upset by the judiciary." *Haugland v. Bismarck*, 429 N.W.2d 449, 454 (N.D.1988). We normally defer to a reasonable interpretation of a statute by the agency responsible for enforcing it, "especially when that interpretation does not contradict the statutory language." *Turnbow v. Job Service North Dakota*, 479 N.W.2d 827, 830 (N.D.1992). Agency expertise is entitled to appreciable deference if the subject matter is highly technical. *True v. Heitkamp*, 470 N.W.2d 582 (N.D.1991). As *Western Gas Resources, Inc. v. Heitkamp*, 489 N.W.2d 869, 872 (N.D. 1992), explained, deference to an agency's interpretation of a statute "is an important consideration when an agency interprets and implements a law that is complex and technical."

The technical provisions codified in NDCC 49–04–07 are intended to "protect the public both collectively and individually against discrimination by a utility, whether it be unfair to the public by giving an individual preferred treatment or whether it be unfair to the individual by demanding and securing exorbitant fees as a condition of furnishing service." *Lyons v. Otter Tail Power Co.*, 70 N.D. 681, 297 N.W. 691, 693 (1941). Still, this statute authorizes "a public utility to enter into a 'reasonable agreement' concerning rates with its employees." *Montana–Dakota Utilities Co. v. P.S.C.*, 413 N.W.2d 308, 316 (N.D.1987). NDCC 49–04–07 also authorizes a public utility to provide "for a sliding scale of charges." According to *Webster's Third New International Dictionary* 2142 (1971 Ed.), the term "sliding scale" means "a system for raising or lowering tariffs in proportion to the fall or rise of prices."

In one "flexible tariff" precedent, several petitioners objected "that the Commission's allowing pipelines to discount from the maximum rates is in effect an approval of 'undue preference[s]' and 'undue discrimination' in violation of § 4 and 5 of the NGA." *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981, 1009 (D.C.Cir.1987). That appellate court said that a mere rate disparity is not unlawful discrimination. The court also said that judicial acceptance of price differentials based on demand conditions "is longstanding" and noted that "[f]or nearly 100 years, . . . the courts have interpreted the antidiscrimination provisions of the Interstate Commerce Act to allow the ICC to approve differentials justified exclusively by competition." *Id.* at 1011. In *Armco, Inc. v. Pub. Utils. Comm'n*, 69 Ohio St.2d 401, 433 N.E.2d 923 (1982), the court upheld the regulatory agency's approval of a flexible rate schedule with a minimum/maximum range that allowed changes to any level within the range without the formality of an application to change the rate. In *Pennsylvania Retailers' Ass'ns v. Pennsylvania Pub. Util. Comm'n*, 64 Pa. Cmwlth 491, 440 A.2d 1267 (1982), the court upheld a flexible pricing scheme with a "floor" and a "ceiling" under a statute allowing a "sliding scale of rates." The court said:

> In the competitive market area, Bell is forced to adapt its rates to the market for two reasons: (1) if the rates are too high, the customers simply secure the services of the competition; (2) if the rates are so low as to preclude a positive contribution to revenue, Bell would be liable in antitrust for predatory pricing. Consumers are thus fully protected from unreasonable pricing both by marketplace forces and the regulatory process.

*Id.* 440 A.2d at 1270. The court reasoned that "[t]he Commission has adopted what it has determined to be a reasonable and efficient system of rate regulation necessarily different perhaps from other rate-making procedures, but forced to be so by the exigencies of regulating a utility engaged at least partially in the competitive marketplace." *Id.* The court held that the flexible rates did not violate a statute providing that "[n]o public utility shall, as to rates, make or grant unreasonable preference or advantage to any person, corporation . . . or subject any

person, corporation ... to any unreasonable prejudice or disadvantage." *Id.*

In light of these precedents, we defer to the PSC's interpretation of the relevant statutes as authorizing flexible tariffs with approved minimum/maximum ranges that permit the actual charges within the range to be negotiated between the utility and each customer. The authorization of a "sliding scale of charges" by NDCC 49–04–07 is sufficiently broad to encompass rate structures like those challenged here. The PSC's "interpretation is a reasonable interpretation, which 'does not clearly contradict the statutory language' and does not appear to 'exceed[ ] the bounds of the authorizing legislation or ... [be] arbitrary and unjust.'" *NL Industries, Inc. v. North Dakota State Tax Comm'r*, 498 N.W.2d 141, 147 (N.D.1993), quoting *Schaefer v. Job Service North Dakota*, 463 N.W.2d 665, 667 (N.D.1990) and *True v. Heitkamp*, 470 N.W.2d 582, 587 (N.D.1991). We therefore conclude that the PSC's orders approving the challenged rate structures are in accordance with the law and are not beyond the PSC's scope of authority.

■ CCEC argues that the approved tariffs are unlawful because NDCC 49–04–07 prohibits preferences and discrimination. CCEC's reliance on *McGinley v. Wheat Belt Pub. Power Dist.*, 214 Neb. 178, 332 N.W.2d 915 (1983), is misplaced. The only difference between two groups of consumers in that case was the date they requested service, a factor held to be an improper basis for rate disparities between consumers. Here, NSP's different charges are due to differences in customers' costs of switching to alternative fuels, or to differences in the incentives that customers or potential customers might need to engage in economic development in NSP's electric service area. Differences in charges for those competitive reasons are not undue or unreasonable. Nor are we persuaded that providing gas transportation service to interruptible customers with differing costs of alternative fuels, or providing new or increased electric service to customers in need of differing incentives for economic development is service under the same or substantially similar circumstances and conditions.

CCEC contends that "matters of public policy are beyond the scope of the PSC's statutory authority." CCEC's contention is not supported by persuasive authority or reasoning. Although this court said in *Grafton v. Otter Tail Power Co.*, 86 N.W.2d at 202, that the PSC "can initiate no public policies of its own," we are not convinced that, when carrying out the duties delegated to it by the Legislature, the PSC is precluded from considering existing public policy.

■ CCEC asserts that the approved tariffs constitute an improper delegation of the PSC's authority to fix and establish rates. We disagree. When it approved the rate ranges, the PSC approved every level of charge within the ranges. The PSC has delegated no rate-making authority. It still has a continuing duty to monitor rates to guard against unreasonable rates or unlawful discrimination. Rates and contracts are always subject to complaint proceedings before the PSC. NSP's gas transportation customers know what NSP is charging them for natural gas transportation services and they know the prices of alternative energy sources. With that knowledge, customers can tell if NSP's charges are unreasonable or unjustly discriminatory and, if so, can switch energy sources or complain to the PSC. The ability of NSP's customers to monitor NSP's charges, the publicly available pricing indexes for alternative fuels, the watchful eyes of NSP competitors, and the Administrative Agencies Practice Act, NDCC Ch. 28–32, are adequate safeguards to deter arbitrary decision-making by the PSC. As we have explained before in opinions like *Trinity Medical Center v. North Dakota Bd. of Nursing*, 399 N.W.2d 835 (N.D.1987) and *NL Industries, Inc. v. North Dakota Tax Comm'r*, 498 N.W.2d at 146 n. 3: "The Administrative Agencies Practice Act, Ch. 28–32, N.D.C.C., and the Legislature's ability to retract a delegation of authority provide adequate safeguards to deter arbitrary decision-making by the Commissioner, thus avoiding any question about an unconstitutional delegation of legislative authority."

The judgments are affirmed.

NEUMANN, J., VERNON R. PEDERSON, and RALPH J. ERICKSTAD, Surrogate Judges, and DONALD L. JORGENSEN, District Judge, concur.

DONALD L. JORGENSEN, District Judge, RALPH J. ERICKSTAD and VERNON R. PEDERSON, Surragate Judges, sitting in place of VANDE WALLE, C.J., and LEVINE and SANDSTROM, JJ., disqualified.