2017 ND 76

**Casey VOIGT, Appellant**

v.

**NORTH DAKOTA PUBLIC SERVICE COMMISSION and Coyote Creek Mining Company, L.L.C., Appellees**

No. 20160046

Supreme Court of North Dakota.

Filed 03/30/2017

Derrick L. Braaten (argued) and JJ W. England (appeared), 109 North Fourth Street, Suite 100, Bismarck, N.D. 58501–4003, for appellant.

Illona A. Jeffcoat–Sacco, 600 East Boulevard Avenue, Department 408, Bismarck, N.D. 58505–0480 for appellee North Dakota Public Service Commission.

Brian R. Bjella, P.O. Box 2798, Bismarck, N.D. 58502–2798, for appellee Coyote Creek Mining Company, L.L.C.

Kapsner, Justice.

[¶ 1] Casey Voigt appeals from a judgment affirming the Public Service Commission's ("Commission") order that affirmed its conditional approval of a surface coal mining permit for Coyote Creek Mining Company, L.L.C. ("Company"). We conclude the Commission's order complied with applicable law requiring identification and protection of "alluvial valley floors" and sufficiently addressed Voigt's evidence. We further conclude that the Commission's conclusions of law regarding the lack of "alluvial valley floors" within or adjacent to the permit area is supported by the findings of fact and that a reasoning mind reasonably could have determined the Commission's findings of fact were proved by the weight of the evidence from the entire record. We affirm.

I

[¶ 2] Casey Voigt owns several thousand acres of land to the west of Coyote Creek in Mercer County, which he and his family have ranched for decades. His homestead is immediately to the west of Coyote Creek in Section 31 of Township 143N, Range 88W ("Section 31"). In December 2010, Voigt and his wife, represented by an attorney, entered into a surface and coal lease agreement covering approximately 3,509 acres of land, which granted the right to mine their land and provided for various compensation.

[¶ 3] In November 2013, the Company, a subsidiary of The North American Coal Corporation, applied for a surface coal mining permit for a new mine located about ten miles southwest of Beulah. The Company's permit application covers approximately 8,092 acres of land in Mercer County, an area including Coyote Creek. In October 2014, the Commission conditionally approved Permit No. NACC–1302 to allow the Company to engage in surface

mining operations at the Coyote Creek Mine, subject to the right of interested persons to request a formal hearing on its decision. Relevant to this appeal, the permit made the following "alluvial valley floor" determination:

Finding No. 5. The proposed mining operations will not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally sub-irrigated or materially damage the quantity or quality of water in surface or underground water systems that supply these alluvial valley floors [NDCC 38–14.1–21(3)(e) ].

Based on an examination of the geologic and geomorphic characteristics, soils, land use, and the water quality and quantity of streams occurring within or adjacent to the permit area, it has been determined that there are no alluvial valley floors within or adjacent to the permit area. In addition, portions of Coyote Creek near the permit area were previously evaluated for alluvial valley floor potential and Commission staff determined that this creek does not have the characteristics to be considered an alluvial valley floor. Detailed alluvial valley floor investigation reports and determinations are on file with the Commission.

[¶ 4] In November 2014, Casey Voigt requested an administrative hearing before the Commission regarding its conditional approval of the permit allowing the Company to begin construction of the new mine, situated on the Voigts' land. Voigt and his wife own or lease much of the land in the eastern half of the permit area. In requesting a formal hearing on the permit, Casey Voigt raised concerns regarding the size of the permit area, the reclamation practices to be used on the mined land, and his loss of agricultural production due to mining activities.

[¶ 5] The Commission held three days of public hearings on the permit in December 2014 and January 2015. At the hearing, Voigt argued, among other things, that reclamation of the land would be difficult without more stringent permit conditions to protect soil health and prevent compaction. Relevant to this appeal, Voigt also argued that the Company and the Commission had failed to take required steps to adequately identify and protect "alluvial valley floors" on his property, essentially contending alluvium along Coyote Creek is an "alluvial valley floor," as defined under N.D.C.C. § 38–14.1–02(1). Voigt supported his arguments at the hearing with personal and expert witness testimony and documentation. Both the Commission and the Company also presented testimony from expert witnesses and documentary evidence at the hearing.

[¶ 6] In April 2015, the Commission entered a final order, affirming its October 2014 conditional approval of the permit and providing Voigt some relief regarding reclamation issues. In its order, the Commission made eighty-two findings of fact and, on the basis of its findings, made the following relevant conclusions of law:

1. The Commission has jurisdiction over [the Company's] planned mining and reclamation operations in North Dakota, including Permit No. NACC–1302.

2. [The Company's] application for Surface Coal Mining Permit NACC–1302 meets all permit application standards under North Dakota Century Code Chapter 38–14.1 and North Dakota Administrative Code Article 69–05.2.

3. There is no basis for the Commission to rescind or revoke Permit NACC–1302.

. . . .

6. The alluvium along Coyote Creek is not an alluvial valley floor as defined by subsection 1 of N.D.C.C. Section 38–14.1–02.

7. The Commission does not have any jurisdiction over coal or surface leasing terms, conditions or practices.

. . . .

[¶ 7] Voigt appealed the Commission's decision to the district court, specifying issues regarding both the reclamation of the land and the alluvial valley floor determination. In the district court, however, Voigt argued only issues relating to the Commission's alluvial valley floor decision. The district court subsequently entered an order and judgment, concluding the Commission's decision was supported by the weight of the evidence from the record and affirming its conditional approval of the permit.

## II

[¶ 8] The Administrative Agencies Practice Act, N.D.C.C. ch. 28–32, governs an appeal from a Commission decision. Capital Elec. Coop., Inc. v. N.D. Pub. Serv. Comm'n, 2016 ND 73, ¶ 6, 877 N.W.2d 304. We review the Commission's order in the same manner as the district court under N.D.C.C. § 28–32–46. Capital Elec. Coop., ¶ 6. We must affirm the Commission's order unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

Id.; see also N.D.C.C. § 28–32–49.

[¶ 9] The Commission's decision on questions of law is fully reviewable. Capital Elec. Coop., Inc. v. City of Bismarck, 2007 ND 128, ¶ 30, 736 N.W.2d 788. In reviewing the Commission's findings of fact, however, we do not substitute our judgment for that of the Commission or make independent findings. Id.; see Power Fuels, Inc. v. Elkin, 283 N.W.2d 214, 220 (N.D. 1979) ("In construing the 'preponderance of the evidence' standard to permit us to apply the weight-of-the-evidence test to the factual findings of an administrative agency, we do not make independent findings of fact or substitute our judgment for that of the agency."). Rather, in reviewing the Commission's findings of fact, "[w]e determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." Capital Elec. Coop., at ¶ 31 (quoting Power Fuels, at 220). "This standard defers to the [factfinder's] opportunity to hear the witnesses' testimony and to judge their credibility[,] and we will not disturb the agency's findings unless they are against the greater weight of the evidence." Johnson v. N.D.

Dep't of Transp., 530 N.W.2d 359, 361 (N.D. 1995). We have also said that "[a]gency expertise is entitled to appreciable deference if the subject matter is highly technical." Capital Elec. Coop., 2016 ND 73, ¶ 6, 877 N.W.2d 304 (quoting Cass Cty. Elec. Coop., Inc. v. N. States Power Co., 518 N.W.2d 216, 220 (N.D. 1994)).

### III

[¶ 10] Voigt argues the Commission erred in affirming the conditional approval of the coal mining permit for the new mine located partly on his land. He contends the Commission failed to follow and enforce North Dakota's surface mining statutes and regulations that recognize and protect "alluvial valley floors" in issuing the permit.

[¶ 11] Statutes governing North Dakota's surface coal mining and reclamation program are contained in N.D.C.C. ch. 38-14.1:

Chapter 38-14.1, N.D.C.C., is part of North Dakota's surface coal mining and reclamation program established in accordance with the requirements of the federal Surface Mining Control and Reclamation Act of 1977 ["SMCRA"]. See 30 U.S.C. § 1253. The North Dakota program makes the [Commission] "the state regulatory authority for all purposes relating to the Surface Mining Control and Reclamation Act of 1977." N.D.C.C. § 38-14.1-02(4). The [Commission] has several program-related powers and duties, including "issu[ing] permits for surface coal mining operations" and "promulgat[ing] such regulations as may be necessary to carry out the purposes and provisions of this chapter and the Surface Mining Control and Reclamation Act of 1977." N.D.C.C. § 38-14.1-03(10)-(11).

Dakota Res. Council v. N.D. Pub. Serv. Comm'n, 2012 ND 72, ¶ 6, 815 N.W.2d 286.

[¶ 12] Consistent with SMCRA requirements, N.D.C.C. § 38-14.1-21 provides for surface coal mining permit approval and denial standards. Section 38-14.1-21(3)(e), N.D.C.C., in particular, provides for the protection of certain types of valleys with special importance to farming, i.e., statutorily-defined "alluvial valley floors":

3. No permit or revision application may be approved unless the applicant affirmatively demonstrates and the commission finds in writing on the basis of the information set forth in the application or from information otherwise available which will be documented in the approval and made available to the applicant, that all the following requirements are met:

. . . .

e. The proposed surface coal mining operation, if located west of the one hundredth meridian west longitude, would:

(1) Not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally subirrigated, but, excluding undeveloped rangelands which are not significant to farming on said alluvial valley floors and those lands as to which the commission finds that if the farming that will be interrupted, discontinued, or precluded is of such small acreage [hectarage] as to be of negligible impact on the farm's agricultural production; or

(2) Not materially damage the quantity or quality of water in surface or underground water systems that supply these alluvial valley floors. . . .

See also N.D. Admin. Code § 69-05.2-08-13.

[¶ 13] At its core, this case involves the Commission's decision that no "alluvial val-

ley floor," as defined in N.D.C.C. § 38–14.1–02(1), exists within the relevant Coyote Creek stream valley area. An "[a]lluvial valley floor" is defined as "the unconsolidated stream-laid deposits holding streams where water availability is sufficient for subirrigation or flood irrigation agricultural activities but does not include upland areas which are generally overlain by a thin veneer of colluvial deposits composed chiefly of sediment from sheet erosion, deposits by unconcentrated runoff or slope wash, together with talus, other mass movement accumulation, and windblown deposits." N.D.C.C. § 38–14.1–02(1) (emphasis added). Section 69–05.2–01–02(3), N.D. Admin. Code, defines "agricultural activities":

> "Agricultural activities" means, with respect to alluvial valley floors, the use of any tract of land for the production of animal or vegetable life, where the use is enhanced or facilitated by subirrigation or flood irrigation associated with alluvial valley floors. These uses include the pasturing, grazing, or watering of livestock, and the cropping, cultivation, or harvesting of plants whose production is aided by the availability of water from subirrigation or flood irrigation. Those uses do not include agricultural practices which do not benefit from the availability of water from subirrigation or flood irrigation.

(Emphasis added.)

[¶ 14] To provide· standards and procedures for addressing "alluvial valley floors" under N.D.C.C. § 38–14.1–21, the Commission promulgated N.D. Admin. Code § 69–05.2–08–13:

1. Before applying for a permit to conduct operations within a valley holding a stream or in a location where the adjacent area includes any stream, the applicant shall either affirmatively demonstrate, based on available data, the presence of an alluvial valley floor, or submit the results of a field investigation of the permit and adjacent areas. The investigations must include sufficiently detailed geologic, hydrologic, land use, soils, and vegetation studies on areas required to be investigated by the commission, after consultation with the applicant, to enable the commission to make an evaluation regarding the existence of the probable alluvial valley floor in the permit or adjacent area and to determine which areas, if any, require more detailed study in order to make a final determination regarding the existence of an alluvial valley floor. Studies performed during the investigation by the applicant or subsequent studies required of the applicant must include an appropriate combination, adapted to site-specific conditions, of:

   a. Mapping of the probable alluvial valley floor including geologic maps of unconsolidated deposits, delineating the streamlaid deposits, maps of streams, delineation of surface watersheds and directions of shallow ground water flows through and into the unconsolidated deposits, topography showing local and regional terrace levels, and topography of terraces, floodplains, and channels showing surface drainage patterns.

   b. Mapping of all lands included in the area used for agricultural activities, showing the different types of agricultural lands and accompanied by measurements of vegetation productivity and type.

   c. Topographic maps of all lands that are or were historically flood irrigated, showing the location of each diversion structure, ditch, dam and related reservoir.

d. Documentation that areas identified in this section are, or are not, subirrigated, based on ground water monitoring data, representative water quality, soil moisture measurements, and measurements of rooting depth, soil mottling, and water requirements of vegetation.

e. Documentation, based on representative sampling, that areas identified under this subdivision are, or are not, flood irrigable, based on streamflow, water quality, water yield, soils measurements, and topographic characteristics.

f. Analysis of a series of aerial photographs, including color infrared imagery capable of showing any late summer and fall differences between upland and valley floor vegetative growth and of a scale adequate for reconnaissance identification of areas that may be alluvial valley floors.

2. Based on the investigations conducted under subsection 1, the commission will determine the extent of any alluvial valley floors within the study area and whether any stream in the study area may be excluded from further consideration. The commission will determine that an alluvial valley floor exists if:

a. Unconsolidated streamlaid deposits holding streams are present; and

b. There is sufficient water to support agricultural activities as shown by:

(1) The existence of flood irrigation in the area or its historical use;

(2) The capability to be flood-irrigated, based on streamflow water yield, soils, water quality, and topography; or

(3) Subirrigation of the lands from the ground water system of the valley floor.

(Emphasis added.)

[¶ 15] Section 69–05.2–08–13(1), N.D. Admin. Code, thus requires an applicant, before applying for a mining permit, to "affirmatively demonstrate" the presence of an "alluvial valley floor" based on either available data or to submit field investigation results of the permit and adjacent areas. The applicant's investigations must be sufficiently detailed so the Commission can "make an evaluation regarding the existence of the probable alluvial valley floor in the permit or adjacent area and to determine which areas, if any, require more detailed study in order to make a final determination regarding the existence of an alluvial valley floor." Id. The studies performed during the investigation by the applicant, or subsequent studies required of the applicant, must include an "appropriate combination, adapted to site-specific conditions" of the items listed in subdivisions (a) through (f). Id. Section 69–05.2–08–13(2), N.D. Admin. Code, provides the criteria for the Commission's determination that an "alluvial valley floor" exists.

[¶ 16] The parties here do not dispute that the criterion of N.D. Admin. Code § 69–05.2–08–13(2)(a), i.e., "[u]nconsolidated streamlaid deposits holding streams are present," is met in the relevant Coyote Creek area. Voigt's argument on appeal is the Commission erred under N.D. Admin. Code § 69–05.2–08–13(2)(b), in determining whether "[t]here is sufficient water to support agricultural activities as shown by" flood irrigation, flood-irrigation capability, or subirrigation.

[¶ 17] To assist in identifying alluvial valley floors and report preparation, the U.S. Department of Interior's Office of Surface Mining Reclamation and En-

forcement issued "Alluvial Valley Floor Identification and Study Guidelines," dated August 1983 ("OSM Guidelines"). Before applying for the permit at issue in this case, the Company submitted its Alluvial Valley Floor Evaluation Report ("2013 Report"), prepared by Dr. David Bickel, to the Commission. This report concluded that no alluvial valley floors, referred to as "AVF," exist within the report's study area, stating that "[t]here is no evidence that the Knife River and Coyote Creek or other drainages within or adjacent to the AVF study area meet any of the criteria essential for determining them to be AVF."

[¶ 18] The 2013 Report also incorporated an earlier Coyote Creek Alluvial Valley Floor Study ("2009 Report") that had been prepared and submitted as part of a permit revision for another company, Dakota Westmoreland Corporation ("DWC"). The 2009 Report also concluded a portion of the same area at issue in this case, including the Coyote Creek stream valley and specifically Section 31, does not contain an alluvial valley floor. The Commission concurred in that 2009 determination. Both the 2013 and 2009 Reports refer to OSM Guidelines in analyzing the relevant study areas. Additionally, the Commission's Reclamation Division staff conducted its own independent field investigations of the 2013 and 2009 Reports' study areas, and each field review report concluded alluvial valley floors, as defined under N.D.C.C. § 38-14.1-02, were not present in the areas adjacent to Coyote Creek within the study areas.

[¶ 19] Voigt argues that the Company's permit application did not comply with the Commission's implementing statute and regulations because the Company did not affirmatively demonstrate Voigt's lowland alfalfa fields, located in Section 31 adjacent to Coyote Creek, are not "subirrigated," and did not affirmatively demonstrate lands adjacent to Coyote Creek are not "flood irrigable." He also argues the Commission's decision does not comply with its own regulations, which he contends require "significantly more detailed analysis" to determine the presence or lack of an alluvial valley floor; its decision is based on findings of fact that are unsupported by the administrative record; and its findings of fact failed to address detailed evidence Voigt presented.

[¶ 20] Voigt requests this Court to reverse the Commission's approval of Permit No. NACC–1302 and underlying order affirming the permit, to find the Commission acted without "substantial justification" and to award attorney fees under N.D.C.C. § 28-32-50(1).

A

[¶ 21] Voigt argues the Commission's permit approval was unlawful because the Company did not affirmatively demonstrate Voigt's lowland alfalfa fields are not subirrigated and the weight of the evidence shows his lowland alfalfa fields are subirrigated. For purposes of the alluvial valley floor determination under N.D. Admin. Code § 69-05.2-08-13(2)(b), "subirrigation" has been defined:

"Subirrigation" means, with respect to alluvial valley floors, the supplying of water to plants from a semisaturated or saturated subsurface zone where water is available for use by vegetation. Subirrigation may be identified by:

a. Diurnal fluctuation of the water table, due to the differences in nighttime and daytime evapotranspiration rates;

b. Increasing soil moisture from a portion of the root zone down to the saturated zone, due to capillary action;

c. Mottling of the soils in the root zones;

d. Existence of an important part of the root zone within the capillary fringe or water table of an alluvial aquifer; or

e. An increase in streamflow or a rise in ground water levels, shortly after the first killing frost on the valley floor.

N.D. Admin Code § 69–05.2–01–02(103).

[¶ 22] At the hearing, the Commission heard testimony from three main experts on the alluvial valley floor issues: Charles Norris for Voigt; Dr. David Bickel for the Company; and Bruce Beechie, who works for the Commission's Reclamation Division as a geologist and hydrologist. In its April 2015 order, the Commission made specific findings of fact regarding the "subirrigation" issue for the alluvial valley floor determination. The Commission's findings addressed the testimony of both Charles Norris and Voigt:

55. Mr. Charles Norris, a geologist/hydrologist with Geohydro, Inc. of Denver, CO, testified about the AVF determinations associated with Permit NACC–1302. Mr. Norris testified about his past consulting work that involved water issues related to surface mining and, more specifically, his work on AVF issues at three western mines including the proposed South Heart Mine in North Dakota. Mr. Norris said he believes the AVF section of the permit is deficient since enough data was not provided for the AVF determinations. He testified that the draft AVF reconnaissance study by the federal Office of Surface Mining (OSM) shows some areas along Coyote Creek as being subirrigated and likely an AVF. Mr. Norris said that if subirriga-

tion occurs and hay production is enhanced in that area, such an area would be considered an AVF.

56. Mr. Norris testified that pre-application AVF studies and data requirements vary from state to state and from mine to mine depending on the site specific conditions. However, he believed that more data should have been collected for the Coyote Creek AVF determination, such as data from installing ground water monitoring wells to obtain measurements for water level profiles and daily water level changes to determine if subirrigation occurs along the creek.

57. Mr. Norris disagreed with the AVF determinations made by Commission staff that areas along Coyote Creek through Mr. Voigt's property are not an AVF. He especially disagreed about staff's finding that subirrigation does not occur along Coyote Creek.

58. Mr. Norris testified he never visited the site but, he believes subirrigation occurs along Coyote Creek and enhances the production of alfalfa on Mr. Voigt's hay field located on the Coyote Creek alluvium.

59. Mr. Voigt also testified about his hay yields in lowland fields along Coyote Creek and others in upland areas. Exhibit CV–7 contains those yield numbers for the past several years. He also testified that the water level in his wells near Coyote Creek are 15 feet and 17 feet from the surface, but he had been told that alfalfa roots will go down to 20 feet.

[¶ 23] The Commission also made findings of fact regarding Dr. David Bickel's testimony on the lack of an alluvial valley floor and the "subirrigation" issue:

60. Dr. David Bickel, consultant and former hydrologist/geologist with the Reclamation Division, testified about AVF evaluation reports that he has prepared as a consultant, including one for [the Company]. Dr. Bickel also testified about his experience in reviewing requests for AVF determinations, his use of the OSM AVF guidance documents, and writing related permit findings while employed at the Public Service Commission. Since retiring from the Commission, Dr. Bickel said he has prepared five AVF evaluation reports that have been reviewed and approved by the Reclamation Division.

61. Dr. Bickel said AVF evaluation reports are prepared well before mining since additional data may need to be obtained for making an AVF determination. He testified that adequate data was available to make the AVF determinations in the two reports that involved areas along Coyote Creek.

62. Dr. Bickel testified that he had reviewed the 2009 AVF evaluation report by Dakota Westmoreland Corporation for its nearby Beulah Mine and that study area included two of Mr. Voigt's hayfields in Section 31 along Coyote Creek. He agreed with the [Commission's] Reclamation Division's determination that no AVF[ ]s were present in the study area. Dr. Bickel testified he found no evidence of significant subirrigation during his investigation based on the vegetation and soil properties in the areas and on data from groundwater wells.

63. Dr. Bickel testified that he also prepared an AVF evaluation report for [the Company] covering the portion of Coyote Creek that is downstream of Mr. Voigt's land and part of the Knife River. As the result of his study he also determined that no

AVF's were present and the Reclamation Division agreed with his determination.

64. Dr. Bickel testified that any subirrigation along Coyote Creek was limited to very small areas adjacent to the stream bed and that these areas were only a few feet wide. He also said he had reviewed alfalfa production in Mr. Voigt's hayfields. While the water table was 8 to 10 feet below the surface in late summer and that some of the deep rooted plants such as alfalfa would reach it, Dr. Bickel testified that no subirrigation of significance was noted.

65. Dr. Bickel further testified that soils along Coyote Creek are classified as a "Straw" soil type and that soil type is not considered a subirrigated soil by the Natural Resources Conservation Service ["NRCS"]. He also said he believed that having groundwater monitoring well data with daily water level fluctuations was not necessary for the Coyote Creek AVF determinations because sufficient data was otherwise available to make the AVF determinations.

. . . .

67. Dr. Bickel also testified that the main reason AVF requirements are included in the federal reclamation act is to protect agriculture production along streams in the more arid regions of the United States where the production of hay and other crops along streams is essential to livestock production and other agricultural activities. While the AVF requirements apply to western North Dakota since this part of the State is west of the 100th meridian west longitude, he said that a classic area is along the Powder River

(located further west in Montana and Wyoming). Dr. Bickel further testified that "regional climate in west central North Dakota enables areas, other than stream floodplains, to produce hay crops, including alfalfa, and thus regional livestock production is not dependent on stream valleys for hay production and other feed as is often the case in arid areas further to the west."

[¶ 24] Regarding the testimony of Bruce Beechie, the Commission found the following:

69. Mr. Bruce Beechie, geologist/hydrologist with the Reclamation Division, testified about the AVF review process used by Commission staff and the finding that no AVF exists along Coyote Creek. He said staff's field review that was conducted in 2009 for the Dakota Westmoreland permit revision focused on Mr. Voigt's field in Section 19 and the northern part of Section 30 along Coyote Creek since it was the most predominant tract of cropland along the creek.

70. Mr. Beechie testified that he is familiar with and uses OSM's AVF guidance documents and AVF reconnaissance maps of west-central North Dakota. He said that infrared photos were used by OSM to identify areas that are "potential" AVF[ ]s in the reconnaissance maps for west central North Dakota and that the OSM maps were used when he reviewed the AVF study reports that covered areas along Coyote Creek.

71. Mr. Beechie testified about the ground water level information along Coyote Creek that was available from the Oliver/Mercer Geo-

logic and Water Resources Report (published by the North Dakota State Water Commission) and the water levels in wells near Mr. Voigt's home. The reported depths to the water table varied from 15 to 20 feet below surface.

72. OSM's AVF Study Guidelines, Exhibit CV–15, contains Table B–4 on page B–19 that lists a water extraction depth for alfalfa of five feet (or 60 inches). Elsewhere in that guideline, statements are included that some alfalfa roots can go much deeper than five feet. However, page C–11 of that guideline includes a statement that "subirrigation may provide enough water to maintain alfalfa but not enough to enhance its production." None of the evidence presented at the hearing indicates that subirrigation significantly enhances hay production on Mr. Voigt's fields along Coyote Creek. The overall higher hay production from those fields compared to his upland hayfields is due to the inherent high productivity of the Straw soils, which the NRCS classified as not subirrigated.

73. Mr. Beechie further testified that he is very comfortable with the negative AVF determinations that have been made for areas along Coyote Creek and that a positive AVF determination would have been indefensible.

[¶ 25] Additionally, the Commission made findings addressing relevant testimony from Dean Moos, the Reclamation Division's assistant director, and Sarah Flath, the Company's senior environmental specialist, on the subirrigation issue:

66. Mr. Dean Moos, assistant director of the Reclamation Division and a registered professional soil classifier in

North Dakota, testified that he participated in the 2009 AVF field review of areas along Coyote Creek and he visually examined the soil profiles at several locations to verify that the soil types along Coyote Creek were correctly mapped as "Straw". He said that Straw soils are a floodplain soil developed in stream-laid deposits and they are highly productive, high in organic matter, and make good cropland. He also said that the Straw soil is designated as a 'prime farmland' soil by the NRCS. Mr. Moos further testified that the depth to groundwater for a Straw soil is greater than 80 inches according to the NRCS, indicating the soil is not subirrigated.

. . . .

68. Ms. Flath testified that the expected alfalfa production on Casey Voigt's hayland in the mining permit area based on the pre-mine soil map units and the NRCS expected yields would be 75% higher on the lowland fields compared to the upland fields. She further testified that Exhibit CV–7, with yield values for Voigt['s] lowland and upland hayfields, shows that the lowland hayfields averaged only 47% higher compared to the upland hayfields. In addition, during the relatively dry year of 2012, she said the production on the lowland fields was considerably less than the other five years. Ms. Flath testified if the lowland fields had received supplemental moisture from subirrigation separate from precipitation, the production should not have dropped off nearly as much as it did. She also noted that the yields of the first alfalfa cuttings in 2013 and 2014 from the uplands fields exceeded that of the lowland fields.

[¶ 26] Voigt argues N.D. Admin. Code § 69–05.2–08–13(1) requires the Commission to collect a "substantial amount" of information to decide whether an alluvial valley floor exists "at a particular location." He asserts that while requiring an "appropriate combination" of information listed in N.D. Admin. Code § 69–05.2–08–13(1)(a) through (f) is "vague," subsections (d) and (f) apply to subirrigation and an applicant must collect an "appropriate combination" of data described in these two subsections. Voigt asserts the Company did not collect any of the information described in subsections (d) and (f) for Voigt's lowland alfalfa fields, and the Company only relied on "three sentences" from the Dakota Westmoreland 2009 Report, which relied on visual observation of the lowland alfalfa fields.

[¶ 27] Voigt contends "visual observation" is not information listed in N.D. Admin. Code § 69–05.2–08–13 as data to support the existence or lack of subirrigation. Voigt further asserts his expert, Charles Norris, "discredited" the 2009 Report's three sentences at the administrative hearing. Voigt therefore argues the "sole piece of evidence" to support an affirmative finding the lowland alfalfa fields are not subirrigated is "effectively useless." Voigt also contends the Company did not provide the type of data described in N.D. Admin. Code § 69–05.2–01–02(103), defining "subirrigation," for methods to identify subirrigation. Because the Company purportedly did not provide legally required data to support its mining permit application, Voigt asserts the Commission had "no authority" to approve the permit under N.D.C.C. § 38–14.1–21(3)(e) and did not act in accordance with the law as required by N.D.C.C. § 28–32–46(1).

[¶ 28] We have explained that "[a]n administrative agency's reasonable interpretation of a regulation is entitled to

deference." People to Save the Sheyenne River, Inc. v. N.D. Dep't of Health, 2008 ND 34, ¶ 15, 744 N.W.2d 748. "[C]ourts generally defer to an agency's reasonable interpretation when the language is so technical that only a specialized agency has the experience and expertise to understand it or when the language is ambiguous." N.D. Sec. Comm'r v. Juran and Moody, Inc., 2000 ND 136, ¶ 25, 613 N.W.2d 503 (quoting In the Matter of Permits to Drain Related to Stone Creek Channel Improvements and White Spur Drain, 424 N.W.2d 894, 900 (N.D. 1988)). "An agency has a reasonable range of discretion to interpret and apply its own regulations, and the agency's expertise is entitled to deference when the subject matter is complex." St. Benedict's Health Ctr. v. N.D. Dep't of Human Servs., 2004 ND 63, ¶ 9, 677 N.W.2d 202.

[¶ 29] Although Voigt argues, and his expert Norris testified, that not enough data was provided to comply with the applicable statutes and regulations, Dr. Bickel testified and the Commission found adequate data was available to make the alluvial floor determination, which includes the 2013 and 2009 reports, the two field reviews, and supporting documents. The reports and field reviews all concluded no alluvial valley floors exist in the relevant Coyote Creek and Knife River areas. While Voigt asserts a lack of sufficient data, specifically under N.D. Admin. Code § 69–05.2–08–13(1)(d) and (f), for the "particular area" of Voigt's lowland alfalfa fields, the Commission is not so limited to these two subsections in its analysis, and it falls within the Commission's discretion to decide the "appropriate combination, adapted to site-specific conditions" of data and information required to comply with its regulation. See Stone Creek Channel Improvements, 424 N.W.2d at 900 ("While an administrative agency is certainly bound by its own duly issued regulations,

an agency nevertheless has a reasonable range of informed discretion in the interpretation and application of its own rules." (citation omitted)).

[¶ 30] After receiving conflicting testimony at the hearing on whether sufficient information was available, the Commission considered all of the data available at that time and decided no alluvial valley floors exist within the relevant Coyote Creek stream valley area. In arguing insufficient evidence was submitted regarding the particular area, Voigt contends his expert discredited the 2009 Report and, further, discounts the data and information relied upon by the experts in reaching their opinions, but "[d]etermining the credibility of witnesses and the weight to be given their testimony is the exclusive province of the [fact-finder]." Huff v. N.D. State Bd. of Med. Exam'rs, 2004 ND 225, ¶ 14, 690 N.W.2d 221. On this record, we cannot say the Commission's interpretation of the "appropriate combination" of information required to make its decision was contrary to law, and sufficient evidence was presented during the hearing to support the Commission's alluvial valley floor determination.

[¶ 31] Voigt contends the Commission's findings of fact did not address the Company's purported failure to affirmatively demonstrate a lack of subirrigation at the lowland alfalfa fields, which violated N.D.C.C. § 28–32–46(7) ("The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant."). As discussed, however, the Commission's findings addressed conflicting evidence regarding subirrigation at the lowland alfalfa fields in its alluvial valley floor determination. We conclude the Commission's findings reflect the reasonable findings of a reasoning mind and sufficiently address the conflicting evidence, including Voigt's evidence

and his expert's testimony. See Victor v. Workforce Safety & Ins., 2006 ND 68, ¶ 13, 711 N.W.2d 188. We conclude the findings sufficiently address the evidence Voigt presented.

[¶ 32] The Commission specifically found that "[n]one of the evidence presented at the hearing indicates that subirrigation significantly enhances hay production on Mr. Voigt's fields along Coyote Creek" (emphasis added), but Voigt argues "enhancement of agricultural productivity" is not the correct standard for identifying an alluvial valley floor under N.D. Admin. Code § 69–05.2–08–13(2). He further asserts the correct standard is provided in the definition of "agricultural activities" in N.D. Admin. Code § 69–05.2–01–02(3) ("the use of any ... land for the production of animal or vegetable life, where the use is enhanced or facilitated by subirrigation or flood irrigation associated with alluvial valley floors"). He argues the Commission imposed a higher standard by adding the word "significantly" in the finding and by ignoring the words "facilitated" and "aided" as provided in the full definition.

[¶ 33] The Commission responds that "enhancement of productivity" is the correct standard because N.D.C.C. § 38–14.1–02(1) defines "alluvial valley floor" as requiring "water availability ... sufficient for subirrigation or flood irrigation agricultural activities," and the definition of "agricultural activities" under N.D. Admin. Code Section 69–05.2–01–02(3) requires the subirrigation or flood irrigation enhance or facilitate production. The Commission further asserts "[n]ominal subirrigation is not enough to support a positive AVF determination," and the OSM Guidelines state that "[a]gricultural crops or rangeland must receive enough subirrigation that the community is notably more productive or more agriculturally useful when compared to dryland areas."

[¶ 34] Although Voigt asserts his alfalfa fields adjacent to Coyote Creek are proof of an alluvial valley floor, the Company also contends both Dr. Bickel's testimony and the OSM Guidelines demonstrate "alfalfa is excluded from a determination of subirrigation." The relevant OSM Guideline language states that:

[S]ome low-lying areas have greater vegetation productivity than adjacent uplands merely because of better soils, snowdrift accumulation, or occasional flood overflow. These areas are not considered to be subirrigated, and one of the tasks of identification studies is to distinguish those valley areas whose productivity is a result of subirrigation, and not a result of water from some other source. The water availability criterion excludes areas that could be developed for subirrigation; e.g., by establishing deep rooting alfalfa to tap ground water not presently used by native vegetation.

While there may be contrary evidence regarding Voigt's lowland alfalfa fields, evidence in the record also suggests agricultural activities are not enhanced or facilitated by subirrigation. The Commission contends that "nominal subirrigation" is insufficient to show enhanced agricultural activities under the regulations to support a positive alluvial valley floor determination. Again, we defer to the Commission's reasonable interpretation of its own regulation "when the language is so technical that only a specialized agency has the experience and expertise to understand it or when the language is ambiguous." Juran and Moody, 2000 ND 136, ¶ 25, 613 N.W.2d 503.

[¶ 35] Voigt argues the Commission's permit approval was unlawful because the "overwhelming weight" of the evidence, in fact, shows Voigt's lowland alfalfa fields are subirrigated. He contends he provided

"ample evidence" and the weight of the evidence is overwhelming. He also contends the Company's own expert, Dr. Bickel, testified that when planting alfalfa on Voigt's two fields, plants can "reach and utilize ground water." He therefore contends that the Commission's conclusion that the alluvium along Coyote Creek is not alluvial valley floor is not supported by a preponderance of the evidence. See N.D.C.C. § 28–32–46(5).

[¶ 36] Here, Dr. Bickel, the Company's expert, testified he found no evidence of significant subirrigation during his investigation based on the vegetation and soil properties in the areas and on data from groundwater wells. He testified:

> No significant areas of potential subirrigation were identified in Mr. Krabbenhoft's vegetation and wetland studies. No areas of soils indicative of subirrigation were observed or mapped by Prairie Soils Consulting. No static water level and groundwater monitoring wells including—or indicated any shallow saturated zones in the floodplain areas. No areas of standing water within a few feet below basically where soil surfaces come onto the banks of streams were seen and this would indicate a probability of shallow saturated zones under stream floodplains. Now, small trivial bands of subirrigation a few feet wide can occur along banks of all bodies of standing water, and these are small. We're talking in scale of a few square feet. They're often patchy, and these are things I think everyone has commonly observed. Basically we're talking about an area where soils and vegetation slopes down very close to water level. These areas are insignificant in terms of agriculture.

On the basis of the various studies and voluminous data collected, both Dr. Bickel and Beechie, the Commission's expert, opined that no subirrigation is occurring. Additionally, Moos testified regarding the lack of subirrigated soils, and Flath testified that soils, rather than subirrigation, explain the difference in productivity between Voigt's upland and lowland alfalfa fields.

[¶ 37] We will not substitute our judgment for that of the Commission or make independent findings. See Power Fuels, 283 N.W.2d at 220. From our review of the record, we conclude a reasoning mind could reasonably conclude that Voigt's lowland alfalfa fields are not subirrigated and the weight of the evidence shows his lowland alfalfa fields are not subirrigated as contemplated by N.D. Admin. Code § 69–05.2–08–13(2)(b).

B

[¶ 38] Voigt argues the Commission's permit approval was unlawful because the Company did not affirmatively demonstrate the lands adjacent to Coyote Creek lack capability to be "flood irrigated" and because evidence shows the adjacent lands are, in fact, capable of being "flood irrigated." Under N.D. Admin Code § 69–05.2–01–02(34), " 'Flood irrigation' means, with respect to alluvial valley floors, supplying water to plants by natural overflow, or the diversion of flows in which the surface of the soil is largely covered by a sheet of water."

[¶ 39] In its April 2015 order, the Commission again made specific findings of fact regarding both the sufficiency of water for flood irrigation and the flood irrigation potential for an alluvial valley floor:

> 53. The DWC and [the Company] AVF studies found that no artificial flood irrigation was present in the areas studied along Coyote Creek. Discussion that begins near the bottom of Page 25 of DWC's 2009 AVF study report, Exhibit CV–3, states

that the NRCS office in Mercer County was contacted about irrigation in Mercer County and the local office personnel reported they were not aware of any surface irrigation systems on Coyote Creek or other such stream valleys to the south of the Knife River. Section 2.2.1 of the permit states that, except for snow-melt and extreme precipitation events, flow and surface water availability in the channel is very limited. The DWC study also indicates that natural flooding is rare along Coyote Creek and is only likely to occur during more extreme runoff events.

54. Page 26 of DWC's 2009 AVF study report, Exhibit CV–5, discusses the potential for flood irrigation along Coyote Creek. The report states that placing a dam on the creek or pumping water to a storage facility would be needed to provide enough water for irrigating cropland. However, neither option was likely due to the lack of areas for storing the water, and the expense. As previously noted, artificial flood irrigation by diverting stream flows is not a common practice in Mercer County and surface water flows in Coyote Creek are very low most of the time. The potential for flood irrigation along Coyote Creek is very low. Also, the water quality in Coyote Creek is marginally suitable for limited or restricted irrigation based on salinity (electrical conductivity) information provided on Page 27 in the DWC 2009 AVF Report, Exhibit CV#3, and the related information provided on Pages 14 and 15 of the [Company's] 2013 AVF Report, Exhibit CV#5.

[¶ 40] Voigt asserts that while the Dakota Westmoreland 2009 Report collected streamflow data, salinity data, and topographic information, it "does not comport with common sense" to use that report to support the conclusion that flood irrigation potential is "remote" because, he contends, the three reasons the 2009 Report provides are unsupported by the rest of the Report. He therefore contends that the Company has not "affirmatively demonstrated" this fact, as required under N.D.C.C. § 38–14.1–21(3)(e) and N.D. Admin. Code § 69–05.2–08–13(1). Voigt argues the 2009 Report instead supports that the land adjacent to Coyote Creek is capable of being flood irrigated. Voigt argues, therefore, the Commission's finding of fact, relating to the capability of flood irrigation and stating the potential for flood irrigation is "very low," is not supported by a preponderance of the evidence as required under N.D.C.C. § 28–32–46(5). Voigt contends all of the evidence in the record points to the contrary.

[¶ 41] All of the evidence does not point to the contrary. Both the Commission and the Company rely on data and testimony supporting the Commission's findings. The Company asserts that while Coyote Creek occupies a valley holding deposits of shallow alluvium, it was demonstrated by the four studies completed by industry experts and the Commission that no evidence shows flood irrigation in the area or its historical use, nor does Coyote Creek have the capability to be flood irrigated. The Commission also asserts sufficient evidence shows flood irrigation is not and has not been a practice along Coyote Creek and evidence supports the conclusion the area is not flood irrigable. We conclude a reasoning mind could reasonably conclude that the lands adjacent to Coyote Creek lack capability to be flood irrigated and the weight of the evidence shows the adjacent lands are not capable of being flood irri-

gated, as contemplated by N.D. Admin. Code § 69–05.2–08–13(2)(b).

[¶ 42] The Commission maintains that ample evidence supports its determination of no alluvial valley floor within the Coyote Creek valley and the record is voluminous and highly technical and scientific. The Company also asserts a preponderance of the evidence supports the Commission's determination of no alluvial valley floor within the Coyote Creek valley and it complied with the relevant statutes and regulations by determining whether an alluvial valley floor exists before the filing of the permit application. Based on our review of the record, we believe this case presents a classic battle of the experts in the Commission's determination regarding whether an alluvial valley floor exists in a particular area, and "[a]gency expertise is entitled to appreciable deference if the subject matter is highly technical." Cass Cty. Elec. Coop., 518 N.W.2d at 220.

[¶ 43] We conclude the Commission's order complied with applicable law requiring identification and protection of alluvial valley floors and sufficiently addressed Voigt's evidence. We further conclude the Commission's conclusions of law regarding the lack of alluvial valley floors is supported by the findings of fact and a reasoning mind reasonably could have determined the Commission's findings of fact were proved by the weight of the evidence from the entire record.

C

[¶ 44] Voigt requests this Court to find the Commission acted without "substantial justification" and award him attorney fees under N.D.C.C. § 28–32–50(1). This section "requires a court to award a non-administrative agency party attorney's fees and costs if the court rules in favor of that party and it determines an administrative agency acted without substantial justification in the same civil judicial proceeding." Schock v. N.D. Dep't of Transp., 2012 ND 77, ¶ 41, 815 N.W.2d 255 (emphasis added). We decline Voigt's request because he is not the prevailing party.

IV

[¶ 45] We have considered Voigt's remaining arguments and deem them to be without merit or unnecessary to our opinion. The district court judgment affirming the Commission's order is affirmed.

[¶ 46] Carol Ronning Kapsner

Lisa Fair McEvers

Daniel J. Crothers

Dale V. Sandstrom, S.J.

Gerald W. VandeWalle, C.J.

[¶ 47] The Honorable Jerod E. Tufte was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge Dale V. Sandstrom, sitting.